**QUALITY TOOLING, INC.,**
**Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant–**
**Appellant.**

No. 93–1234.

United States Court of Appeals,
Federal Circuit.

Jan. 31, 1995.

E. Mabry Rogers, Bradley, Arant, Rose & White, Birmingham, AL, argued for plaintiff-appellee. With him on the brief was John J. Park, Jr.

John K. Lapiana, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director and Bryant G. Snee, Asst. Director. Also on the brief was Capt. Timothy Saviano, General Litigation Branch, Dept. of the Army, Arlington, VA. Of counsel was Thomas W. Petersen.

Before PLAGER and SCHALL, Circuit Judges, and PRATT,* Senior Circuit Judge.

PLAGER, Circuit Judge, with whom PRATT, Senior Circuit Judge, joins.

This case requires us to reconcile the jurisdiction of the United States Court of Federal

---

* Judge George C. Pratt, United States Court of Appeals for the Second Circuit, sitting by desig- nation.

Claims over contract disputes to which the Federal Government is party with the power of the United States District Court, sitting in bankruptcy, to bring all matters affecting the bankrupt's estate into one proceeding. This is a case of first impression in this court.

The District Court for the Northern District of Alabama, sitting in bankruptcy, determined that it possessed subject matter jurisdiction to entertain a complaint seeking declaratory and monetary relief based upon a contract in a dispute otherwise governed by the exclusive provisions of the Contract Disputes Act of 1978, Pub.L. No. 95–563, 92 Stat. 2383 (1978) (CDA). The District Court then denied the Government's motion to transfer the cause to the Court of Federal Claims. The United States has taken this appeal pursuant to 28 U.S.C. § 1292(d)(4)(A),[1] which permits appeals to this court from interlocutory orders of a district court denying, in whole or in part, a motion to transfer an action to the Court of Federal Claims under 28 U.S.C. § 1631 (dealing with transfers to cure want of jurisdiction).

We conclude that in a case such as this, Congress gave concurrent jurisdiction to both the District Court, under the Bankruptcy Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549, codified as amended as Title 11 of the United States Code (Bankruptcy Act), and the Court of Federal Claims, under the Contract Disputes Act. The initial decision as to which is the proper forum to resolve a particular contract dispute is for the District Court, applying the proper standards. The cause is remanded to the District Court with instructions to reconsider its denial of the transfer motion in light of these standards.

## BACKGROUND

The United States Army (Army) contracted with Quality Tooling, Inc. (Quality) for the manufacture of certain parts required by the Army for a missile system. The parties to the contract had a falling out over Quality's performance (or lack of it), and were unable to settle the dispute amicably. The Army terminated the contract for default on October 11, 1990, and informed Quality that it owed the Government for losses that, the Army alleged, had been caused by Quality's default.

Quality then brought suit against the Government in the Court of Federal Claims[2] pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act of 1978, 41 U.S.C. § 609 (CDA), one of the established routes for resolution of a government contract dispute. In its suit Quality alleged that the Army had in fact terminated the contract for the convenience of the government, that the Army was therefore not entitled to recover damages as a result of a default, and that Quality was due money both under the termination for convenience clause and for incidental expenses.[3] While the contract dispute was pending before the Court of Federal Claims, Quality petitioned the District Court of the District of Columbia for protection under Chapter 11 of the Bankruptcy Act. At Quality's request, Quality's bankruptcy case was subsequently transferred to the District Court for the Northern District of Alabama, where Quality is located. After a series of moves and countermoves by the parties, Quality's contract claim against the United States, pending in the Court of Federal Claims, ended up in the hands of the District Court for the Northern District of Alabama, sitting in bankruptcy.

The Government then moved, pursuant to 28 U.S.C. § 1631, to transfer the contract dispute back to the Court of Federal Claims, arguing that the District Court, sitting in bankruptcy, was without jurisdiction to try

---

1. Unless otherwise specified, citations are to the 1988 edition of the United States Code.

2. The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, §§ 804, 902, 106 Stat. 4506, 4516 (1992), changed the name of the United States Claims Court to the United States Court of Federal Claims. For the sake of clarity, this opinion uses the latter name.

3. The history of this case is marked by the not atypical maneuvering by the parties. The original complaint filed by Quality in the Court of Federal Claims arguably did not contain allegations that brought it under the Contract Disputes Act. Later actions, followed by various trial court rulings, arguably cured the defect. These matters are not before us on appeal, and need not be recited in detail as they do not go to the central issue that is before us.

the issue, and that the proper forum for resolution of the contractual claims was the Court of Federal Claims. The District Court denied the Government's motion. The Government duly appealed the denial to this court pursuant to 28 U.S.C. § 1292(d)(4), which establishes this court's jurisdiction over interlocutory appeals from the grant or denial of a motion to transfer a case from a district court to the Court of Federal Claims.

## DISCUSSION

### I. The transfer from the Court of Federal Claims to the District Court for the Northern District of Alabama.

■ As a preliminary matter, the Government argues that this case was improperly transferred under 28 U.S.C. § 1452 from the Court of Federal Claims to the District Court in Alabama sitting in bankruptcy. In the Government's view, that provision permits transfer only from *state* courts to a bankruptcy court, and a transfer from a federal court of nationwide jurisdiction to a district court is not authorized. In support of the Government's argument, it is noted that § 1452 is the last of a number of sections codified in chapter 89 under the title: "District Courts: Removal of Cases from State Courts," and each of the other sections—1441 through 1451—deals expressly with actions commenced in state courts.

But § 1452 does not refer to actions commenced in state courts. It states simply that "[a] party may remove any claim or cause of action in a civil action" to a district court sitting in bankruptcy. There are two stated exceptions: (i) the proceeding may not be before the United States Tax Court; and (ii) the claim may not be a civil action by a governmental unit to enforce the unit's police or regulatory power.

The specific exclusion of transfers from the United States Tax Court hardly would be necessary if § 1452 dealt only with transfers from state courts. Had Congress wanted to exclude other federal courts, including the Court of Federal Claims, it could have said

so. The Tax Court and the Court of Federal Claims are both Article I courts of nationwide jurisdiction. The Government's argument—that the terms of the statute suffice to exclude courts of national jurisdiction—would make the express exclusion of the Tax Court superfluous.

Enacted as part of the 1984 amendments to the Bankruptcy Act, Bankruptcy Amendments of 1984, Pub.L. No. 98–353, title I, § 103(a), 98 Stat. 333, 335 (1984), section 1452 is designed to address removal of claims related to bankruptcy cases, and to provide for transfer of such claims to the district courts sitting in bankruptcy. Nothing in the language of the section suggests a limit on the courts from which transfer is authorized, other than the two specific exceptions noted, neither of which applies to the case of Quality.[4] The Government notes that the legislative history of § 1452 lacks any debate or deliberation concerning the removability of Court of Federal Claims actions to a bankruptcy court, and that apparently there has been no recorded occasion in which an action was removed from the Court of Federal Claims to a federal district court. The absence of legislative history on the subject hardly proves the negative, and there is a first time for everything. We conclude that 28 U.S.C. § 1452 is not limited by its terms to removing a claim from a state court, and that the transfer here was properly authorized.

### II. The jurisdiction of the District Court and of the Court of Federal Claims over the dispute arising out of the supply contract between Quality and the Army.

■ The Government points out that Quality founded its contract dispute suit upon § 1491 of Title 28, United States Code, the Tucker Act, and § 609(a) of Title 41, which is § 10(a)(1) of the Contract Disputes Act (CDA). The Government is correct that the Tucker Act, in conjunction with the CDA, purports to make the Court of Federal Claims the exclusive trial court for hearing disputes over government contracts that fall

---

**4.** The language in the section indicating that the transfer is "to the district court for the district where such civil action is pending" would suggest that the initial transfer from the Court of Federal Claims would be to the district court for the District of Columbia, which was the case here.

under the CDA. *See* 28 U.S.C. §§ 1346(a)(2), 1491(a)(2). Exclusive appellate jurisdiction over such suits (as well as those which follow the alternate route through an agency board of contract appeals) is in the Court of Appeals for the Federal Circuit. 28 U.S.C. § 1295(a)(3), (a)(10).

But Quality is also correct in contending that when Congress passed the Bankruptcy Act, it anticipated that there would be claims involving a bankrupt's estate that, by statute, were assigned exclusively to some court other than a district court. Congress, wishing to give the district court sitting in bankruptcy plenary authority over the bankrupt's estate and all claims by or against it, expressly provided that the district court would have concurrent jurisdiction over all claims, even those which by statute were within the exclusive jurisdiction of other federal courts:

> Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C. § 1334(b). That Congress intended what the statute states is reinforced by the legislative history:

> There are several objectionable results to the division of jurisdiction of the judicial business generated by bankruptcy cases. The first is delay.... Delay is critical in cases under the Bankruptcy Act, particularly in the business cases where litigation is most likely to occur.
>
> . . .
>
> A comprehensive grant of jurisdiction to the bankruptcy courts over all controversies arising out of any bankruptcy or rehabilitation case would greatly diminish the basis for litigation of jurisdictional issues which consumes so much time, money, and energy of the bankruptcy system and of those involved in the administration of debtors' affairs.

H.R. No. 595, 95th Cong., 2nd Sess. 44–46 (1978) *reprinted in* 1978 U.S.C.C.A.N. 5787, 6006–07.

District courts sitting in bankruptcy have traditionally had broad powers, including authority for "the collection and distribution of the estates of bankrupts and the determination of controversies in relation thereto;.... In such respects the jurisdiction of the bankruptcy courts is exclusive of all other courts." *Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939) (citation omitted). In exercising their authority over bankrupt estates, bankruptcy courts have often treated organs of the Federal Government affected by the bankruptcy as if they were private parties. *See, e.g., United States v. Whiting Pools,* 462 U.S. 198, 209, 103 S.Ct. 2309, 2315–16, 76 L.Ed.2d 515 (1983) ("We see no reason why a different result should obtain when the IRS is the creditor.... Nothing in the Bankruptcy Code or its legislative history indicates that Congress intended a special exception for the tax collector....").

The Bankruptcy Act is thus a codification of the comprehensive authority possessed by bankruptcy courts over bankrupt estates, and on its face includes the disputed contract rights at issue here. In an earlier litigation in the Tenth Circuit the Government conceded that the bankruptcy court has jurisdiction over contract claims such as the one here. *United States v. Bagley (In re Murdock Mach. & Eng'g Co. of Utah),* 990 F.2d 567, 569 (10th Cir.1993). There can be little doubt that, by statute, both the District Court, sitting in bankruptcy, and the Court of Federal Claims are empowered with subject matter jurisdiction over this contract dispute.

### III. The effect of sovereign immunity on the ability of the District Court for the Northern District of Alabama, sitting in bankruptcy, to hear this case.

■ But, argues the Government, the matter is not so easily resolved. In order for the district court, sitting in bankruptcy, to exercise jurisdiction over the United States Government under a contract dispute claim, it is not enough that there is an express statutory grant of jurisdiction. Since the CDA claim is against the Federal Government, there must also be an express waiver of the Govern-

ment's sovereign immunity. And that, says the Government, is a whole different story.

The distinction between a grant to a court of subject matter jurisdiction to entertain a particular claim against a government, and a waiver of that government's sovereign immunity from suit on the claim, first arose in the context of whether a citizen of one state could sue another state in the federal courts. In the early case of *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), the Supreme Court was called upon to interpret Article III of the Constitution, which in pertinent part provides that "The Judicial Power shall extend to all Cases ... between a State and citizens of another State." U.S. CONST. art. III, § 2. The Supreme Court held that a citizen of South Carolina could sue the State of Georgia in the Supreme Court. Disagreeing with his brethren,[5] Justice Iredell relied on the distinction between the Supreme Court's jurisdiction, which Iredell conceded the Constitution *might* be read to grant, and a purported waiver of Georgia's sovereign immunity, which Iredell was sure did not exist. "[E]ven if the Constitution would admit of the exercise of such a power [jurisdiction], a new law is necessary for the purpose, since no part of the existing law applies [to waive sovereign immunity], this alone is sufficient to justify my determination in the present case." *Chisholm*, 2 U.S. (2 Dall) at 449. Justice Iredell's view that the suit should not be entertained was vindicated by the passage of the Eleventh Amendment, which "nullified the Court's decision in *Chisholm*." *Welch v. Texas Dep't of Highways & Public Trans.*, 483 U.S. 468, 484, 107 S.Ct. 2941, 2951, 97 L.Ed.2d 389 (1987) (citation omitted).[6]

More recently, the Supreme Court in *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991), held that the State of Alaska's Elev-

enth Amendment immunity from suit was not abrogated by 28 U.S.C. § 1362, which grants jurisdiction to district courts to hear claims brought by Indian tribes. Regarding the relationship between waivers of sovereign immunity and grants of jurisdiction, the Court observed that "[t]he fact that Congress grants *jurisdiction* to hear a claim does not suffice to show Congress has abrogated all *defenses* to that claim. The issues are wholly distinct." *Id.* at 786–87 n. 4, 111 S.Ct. at 2585 n. 4 (emphasis in original) (Scalia, J., noting with approval Justice Iredell's view in *Chisholm*).

Building on this distinction, the Government here argues that the statute granting jurisdiction to the district courts must contain the applicable waiver of sovereign immunity. The Government acknowledges that, through the Tucker Act, Congress has waived sovereign immunity against claims founded on contracts with the Government. But, a familiar mantra says, waivers of sovereign immunity are to be "strictly construed." *See, e.g., Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 94, 111 S.Ct. 453, 456–57, 112 L.Ed.2d 435 (1990); *Library of Congress v. Shaw*, 478 U.S. 310, 318, 106 S.Ct. 2957, 2963, 92 L.Ed.2d 250 (1986). The Government argues that the Tucker Act waiver of sovereign immunity is limited to its jurisdictional terms: the Government has consented to be sued on a contractual matter *only* in the Court of Federal Claims. That the Government has waived its immunity in the Court of Federal Claims does not imply that the Government has waived its immunity in other courts.

Quality answers that the Tucker Act waives sovereign immunity over claims founded upon government contracts in all courts with jurisdiction to hear such claims. As the Supreme Court has said, the waiver is implicit in the grant of a remedy for claims

---

**5.** In 1793 each justice delivered his own opinion. Therefore, opinions were not yet labeled as they are today: "of the court," "concurring," or "dissenting."

**6.** The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United

States by Citizens of another State, or by Citizens or Subjects of any foreign state." *See generally* William A. Fletcher, *A Historical Interpretation of the Eleventh Amendment*, 35 Stan.L.Rev. 1033 (1983); John E. Nowak, *The Scope of Congressional Power to Create Causes of Action Against State Governments and the History of the Eleventh and Fourteenth Amendments*, 75 Colum.L.Rev. 1413 (1975).

founded upon any express or implied contract with the United States, *United States v. Mitchell,* 463 U.S. 206, 215, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580 (1983),[7] and "[i]f a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit." *Id.* at 216, 103 S.Ct. at 2967. "[T]he Tucker Act effects a waiver of sovereign immunity." *Id.* at 215, 103 S.Ct. at 2967 (citing *Army & Air Force Exchange Serv. v. Sheehan,* 456 U.S. 728, 734, 102 S.Ct. 2118, 2122, 72 L.Ed.2d 520 (1982)); *Hatzlachh Supply Co. v. United States,* 444 U.S. 460, 466, 100 S.Ct. 647, 651, 62 L.Ed.2d 614 (1980) (*per curiam* ). Quality argues that this waiver of sovereign immunity extends to any court with jurisdiction over a suit on a government contract, in this case the bankruptcy court.

■ Quality is correct. The distinction between sovereign immunity and jurisdiction, so strongly urged by the Government, cuts both ways. The Government's waiver of sovereign immunity is not only distinct from, it is logically prior to, the Government's grant of jurisdiction. "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a *prerequisite* for jurisdiction." *Mitchell,* 463 U.S. at 212, 103 S.Ct. at 2965 (emphasis added, footnote omitted). In order for a claim against the United States to be heard, first there must be, because sovereign immunity requires it, consent to be sued; and because, with the exception of the Supreme Court, the subject matter jurisdiction of federal courts is defined by statute, there must be, second, Congressional provision of a court with the authority to hear the claim and grant relief.

■ The inquiry, then, is not whether there is the one, jurisdiction, or the other, a waiver of immunity, but whether there is both, and that requires examining all that Congress has had to say on the subject. "[W]aiver of sovereign immunity is accomplished not by 'a ritualistic formula'; rather intent to waive immunity and the scope of such a waiver can only be ascertained by reference to underlying congressional poli-

cy." *Franchise Tax Bd. of California v. United States Postal Serv.,* 467 U.S. 512, 521, 104 S.Ct. 2549, 2554, 81 L.Ed.2d 446 (1984) (quoting *Keifer & Keifer v. Reconstruction Finance Corp.,* 306 U.S. 381, 389, 59 S.Ct. 516, 517–18, 83 L.Ed. 784 (1939)).

The Supreme Court has long "interpreted the Tucker Act as having provided the consent of the United States to be sued *eo nomine* for the classes of claims described in the Act." *Mitchell,* 463 U.S. at 215, 103 S.Ct. at 2967. The Court added:

> a court need not find a separate waiver of sovereign immunity in the substantive provision [of law granting a right to monetary relief], just as a court need not find consent to suit in 'any express or implied contract with the United States.'... The Tucker Act itself provides the necessary consent.

*Id.* at 218, 103 S.Ct. at 2968 (quoting 28 U.S.C. § 1491).

Just as a statute or contract that creates a right to monetary relief need not contain a redundant waiver of sovereign immunity, a Congressional enactment granting a federal court jurisdiction over a class of cases need not redundantly waive the government's sovereign immunity if it is otherwise waived. "[T]here is simply no question that the Tucker Act provides the United States' consent to suit for claims founded upon statutes or regulations that create substantive rights to money damages." *Mitchell,* 463 U.S. at 218, 103 S.Ct. at 2969. The Tucker Act waives the government's immunity from suit on its contracts in any court to which Congress grants jurisdiction to hear the claim. No further waiver, no "ritualistic formula," *Keifer & Keifer,* 306 U.S. at 389, 59 S.Ct. at 518, is necessary.

The Government argues further, however, that even if the Tucker Act waiver of sovereign immunity extends to courts other than the Court of Federal Claims, when a district court sitting in bankruptcy is the other court, Congress, and the Supreme Court, have limited the Government's exposure to the ex-

---

7. Not to be confused with *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980), cited elsewhere in this opinion.

press waivers of immunity specifically provided in the Bankruptcy Act. In contrast to the broad waivers of sovereign immunity in the Tucker Act and the CDA, the Bankruptcy Act contains three specific waivers of sovereign immunity. These authorize monetary claims against the United States with regard to specified provisions of the Bankruptcy Act, 11 U.S.C. § 106(a); compulsory counterclaims to government claims, 11 U.S.C. § 106(b); and permissive counterclaims to government claims capped by a setoff limitation, 11 U.S.C. § 106(c).[8]

The Government reads *United States v. Nordic Village,* 503 U.S. 30, 34–36, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992) (*Nordic Village* ) for the proposition that in bankruptcy, a claimant against the Government must rely on the waivers of sovereign immunity contained in the Bankruptcy Act. It is uncontested that none of the Bankruptcy Act's three waivers of sovereign immunity apply to Quality's case, and thus, argues the Government, Quality has failed to state a claim on which the Government has consented to be sued.

The Government stretches *Nordic Village* well beyond its facts, and argues for a position that is not supported by either statute or precedent. In *Nordic Village,* an officer of a corporation which had filed for bankruptcy used corporate funds to pay personal income taxes. The bankruptcy trustee sought, and received, a judgment against the Internal Revenue Service (IRS). Ultimately, the Supreme Court reversed. *Nordic Village,* 503 U.S. at 38–40, 112 S.Ct. at 1017.

The bankruptcy trustee contended that 11 U.S.C. § 106(c), as it then stood, provided the requisite waiver of sovereign immunity permitting the trustee to sue the United States for the money stolen from the corporation. The Supreme Court held that the proffered language did not unambiguously subject the government to the judgment of the bankruptcy court in this class of case. Absent a clear expression of Congressional intention to waive the government's immunity from suit, the Court was unwilling to read

into the language of the Act the needed waiver.

In the case before us, Quality relies on the Tucker Act and the CDA for the waiver of sovereign immunity, and not on the explicit waivers or the general language of the Bankruptcy Act. The bankruptcy trustee in *Nordic Village* had no Tucker Act claim. In consequence, the precise question at issue here—whether the waiver of sovereign immunity found in the Tucker Act and in the CDA is valid in another federal court with jurisdiction—was not at issue in *Nordic Village.*

The bankruptcy trustee in *Nordic Village* had no substantive right to payment. Instead, the bankruptcy trustee essentially prayed that the bankruptcy court grant equitable relief—the federal fisc should not profit from theft, and hence the IRS should return the money to the bankrupt's estate, and ultimately, the creditors of the corporation. Quality, on the other hand, has a colorable claim to a substantive right enforceable against the United States, a claim founded on its supply contract with the Army, and for which the CDA expressly provides a remedy.

Here, Congress' intention to waive the government's immunity from suit for a breach of contract is clear and undisputed. The Government does not maintain that it has a right not to pay a damage claim founded on a supply contract governed by the CDA. The issue here is not whether the Government has waived its sovereign immunity, but whether that waiver extends to federal trial fora other than the Court of Federal Claims.

The dissent, along with the Government, argues that waivers of sovereign immunity should be understood to be court specific. In support of this proposition the dissent cites *Minnesota v. United States,* 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235 (1939), and *United States v. Shaw,* 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940). But in each of those cases, the question was whether the United States, without express Congressional assent, should

---

**8.** Section 106 was amended in 1994. Bankruptcy Reform Act of 1994, Pub.L. No. 103–394,

§ 113, 108 Stat. 4106, 4117–18 (1994).

have claims decided against it in the courts *of another sovereign.* In the *Minnesota* case, the probate court in Minnesota purported to adjudicate a claim regarding Indian lands in which the Federal Government had an interest. In *Shaw,* the issue was whether jurisdiction resided in the probate court of Michigan to adjudicate an affirmative claim for money against the United States. In both cases, the Supreme Court concluded that no Congressional act could be found that expressly authorized these state courts to adjudicate the federal interests involved.

In the case before us, the question is not whether Congress has clearly authorized the courts of another sovereign to adjudicate claims against the United States; both courts involved here are creatures of the federal sovereign, created and empowered by Congress with subject matter jurisdiction over the cause.[9] The question is the narrow one of whether Congress, having granted Quality the right to sue the United States on this claim, and having in other legislation granted to two federal courts jurisdiction over such claims, intended the right to sue to be applicable in both federal courts which have jurisdiction. In other words, our inquiry comes down to the simple question of whether there is anything in the governing legislation to suggest that we are to read Congress' intention as preferring the one court to the exclusion of the other in adjudicating this claim. We have found no such indication.

The dissent argues further, however, that in determining what Congress desires, recent decisions of the Supreme Court indicate that grants of sovereign immunity are to be very

narrowly construed, and express legislative words must be found if waiver is to be found. We must of course honor the Supreme Court's current view of the doctrine, but at the same time we may not ignore Congressional intent and purpose.[10]

The Supreme Court has never agreed on the precise basis for the judicially created doctrine of sovereign immunity, and its historical antecedents are obscure.[11] The doctrine receives the brunt of much criticism, for example,

> [L]earned members of the legal profession have been continuously attacking the roots and branches of that judicially planted growth, calling into question not only its utility but even the legitimacy of its alleged origins. Oddly enough this criticism has had a palpable effect upon federal legislators, ... [and] upon state supreme courts. But if the United States Supreme Court is to be judged by what it has done concerning the doctrine, as opposed to what it has from time to time said, criticism seems to have confirmed the Court in the error of its ways.

Scalia, *supra* n. 9, at 867–68 (footnotes omitted).

Be that as it may, it is undisputed that Congress has the final say over whether the immunity of the United States from suit has been waived. With regard to the application of sovereign immunity generally, Congress has chosen through general legislation to waive the government's immunity for most monetary claims resulting from torts of government agents committed against the citi-

---

9. *See* Antonin Scalia, *Sovereign Immunity and Nonstatutory Review of Federal Administrative Action: Some Conclusions from the Public Lands Cases,* 68 Mich.L.Rev. 867, 886 (1970), arguing that the differences between 'domestic' and 'foreign' sovereign immunity—"that is, between the principles governing the amenability of a state to suit before its own courts and those governing its amenability to suit before the courts of another sovereign"—are important in determining application of the immunity doctrine in a particular case.

10. The result in one of the cases relied upon by the dissent, *Nordic Village,* was promptly overturned by Congress by an amendment intended

to reinstate what Congress had believed it had previously done. *See* H.R.Rep. No. 835, 103d Cong., 2d Sess. 42 (1994) U.S.C.C.A.N. pp. 3340, 3350, 3351.

11. *See* the discussion of this question in John Paul Stevens, *Is Justice Irrelevant?,* 87 Nw.U. L.Rev. 1121 (1993). For one view of the issue, *see Kawananakoa v. Polybank,* 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834 (1907) (Holmes, J.: "A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends.").

zenry,[12] as well as for money claims arising out of contracts entered into between the government and private citizens.[13] In addition, Congress has made specific provision for monetary recoveries against the government in a wide variety of legislation.[14]

The problem here is not one of extending the government's exposure to liability for a contractual breach—the government's grant of exposure is conceded if plaintiff can prove his case. The problem is one of construing Congress's intent and purpose regarding the proper forum for resolving this contract dispute. The answer lies not just in the exception provisions of the Bankruptcy Act, as the dissent would have it. The answer requires that we put in *para materia* the relevant provisions of the Bankruptcy Act, expressly granting jurisdiction to district courts over matters otherwise exclusively in other courts, with the language of the Tucker Act and the CDA, waiving in unmistakable terms any claim to sovereign immunity for these contract claims.

Recent Congressional enactments reinforce our view of Congress' purpose regarding concurrent jurisdiction in both the district court and the Court of Federal Claims to entertain CDA matters. Section 10 of the CDA, 41 U.S.C. § 609, was amended in 1994 to add a new subsection (f):

> (1) Whenever an action involving an issue described in paragraph (2) is pending in a district court of the United States, the district court may request a board of contract appeals to provide the court with an advisory opinion on the matters of contract interpretation at issue.

Federal Acquisition Streamlining Act of 1994, Pub.L. No. 103–355, § 2354, 108 Stat. 3243, 3323 (1994).

The "issue described in paragraph (2)" is a CDA claim: "An issue referred to in paragraph (1) is any issue that could be the proper subject of a final decision of a contracting officer appealable under this Act." *Id.* This added provision in the CDA leaves little doubt that Congress understood that district courts might be entertaining CDA claims, pursuant to other provisions of law, and that the district court might need advice regarding aspects of such claims from a board with expertise in government contracting matters.

■ Finally, the dissent argues that if we open the door to this contract dispute, we will have opened the door to wholesale transfers of suits from the Court of Federal Claims to the district courts in a host of cases—takings cases, military pay claims, and other types of entitlement claims. [Op. at 1575.] We do not think so. In the first place, the decision was Congress's, not ours. And we are here talking only about "civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). In the second place, this opinion goes no further than to hold that the District Court sitting in bankruptcy has subject matter jurisdiction to entertain the cause raised by Quality against the United States, and that Congress has waived any claim the United States might have had regarding sovereign immunity for that claim. And thirdly, as we shall next explain, the District Court, before it may undertake to adjudicate the cause, must consider whether as a matter of judicial economy and prudence the cause should be heard by it or by the Court of Federal Claims.

### IV. Determining whether the Court of Federal Claims or the District Court, sitting in bankruptcy, should hear Quality's government contract claims.

We have explained why neither jurisdictional nor sovereign immunity concerns bar the district court, sitting in bankruptcy, from

---

12. *See* Federal Tort Claims Act, ch. 753, Title VI, 60 Stat. 842 (1946) (codified as amended in scattered sections of 28 U.S.C.).

13. *See* Contract Disputes Act of 1978, Pub.L. No. 95–563, 92 Stat. 2383 (1978).

14. *See, e.g.,* Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 106(b)(2), Pub.L. No. 96–510, 94 Stat. 2767 (1980), codified as amended at 42 U.S.C. § 9606(b)(2)(B) (granting authority to sue the United States for reimbursement for compliance costs in certain situations); 28 U.S.C. § 1497 (oyster growers' damages from dredging operations).

hearing Quality's government contract suit. The bankruptcy court and the Court of Federal Claims have concurrent jurisdiction to entertain Quality's suit against the Government. This raises a prudential problem hardly considered by the parties: which court *should* hear the case, and why?

*Gary Aircraft Corp. v. United States (In the matter of Gary Aircraft Corp.),* 698 F.2d 775 (5th Cir.), *cert. denied,* 464 U.S. 820, 104 S.Ct. 82, 78 L.Ed.2d 92 (1983), presented a case similar to the one before this court. Gary Aircraft was a defense contractor who went bankrupt sometime after it had filed, with the Armed Services Board of Contract Appeals (ASBCA), certain contract claims against the Government. In order to determine various questions of priority, the bankruptcy court undertook to determine the value of these claims. The Government appealed the bankruptcy court's action to the district court, lost, and then appealed to the Fifth Circuit.

The Fifth Circuit recognized that the heart of the problem was two facially inconsistent mandates.

> We have been presented with two inclusive, exclusive, sweeping schemes, both of which the Supreme Court has endorsed. The disputes clause [under which contract disputes went to the ASBCA] is something that *no court* can disregard. Bankruptcy courts have jurisdiction exclusive of *all other courts.* Given such conflicting mandates, what is a poor circuit judge to do?

*Id.* at 780 (emphasis in original).

The Fifth Circuit sought the answer in three cases, *Order of Railway Conductors of America v. Pitney,* 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946), *Smith v. Hoboken R.R., Warehouse & S.S. Connecting Co.,* 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946), and *Nathanson, v. NLRB,* 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23 (1952). In each of these cases, the Supreme Court had held that the bankruptcy court should defer to an administrative tribunal. From these cases the Fifth Circuit derived "the general proposition that a bankruptcy court should defer a complicated, technical dispute to a specialized forum." *Gary Aircraft,* 698 F.2d at 783. And from this proposition, the Fifth Circuit reasoned that the bankruptcy court was required to transfer the contract claims to the ASBCA for resolution.

In *United States v. Bagley (In re Murdock Mach. & Eng'g Co. of Utah),* 990 F.2d 567 (10th Cir.1993), the Tenth Circuit confronted the same issue of deferral, although on a somewhat more convoluted set of facts. The bankruptcy court had refused the Government's request to abstain from ruling on the merits of a dispute relating to a contract between the bankrupt and the government. The bankruptcy court had considered five criteria which it abstracted from *Gary Aircraft,* and decided that it had discretion in applying these criteria to the facts before it.[15] Exercising this discretion, the bankruptcy court declined to defer, even though the same contract issues were then pending before the ASBCA.[16]

The Tenth Circuit read *Gary Aircraft* as holding that, "because these criteria were generally present in all government contracts cases, a rule of mandatory deferral was appropriate." *Bagley,* 990 F.2d at 572. The Tenth Circuit rejected that rule in favor of a more flexible one: "Because of the bankruptcy court's duty to timely determine and quantify creditors' claims, we believe the bankruptcy court correctly held that it had

---

15. The five criteria were: (i) resolution of the claims by a specialized tribunal would not impair the requirement that satisfaction of all claims against the bankrupt's estate should proceed in a central forum; (ii) technical and esoteric issues relating to government contracting law are present; (iii) the specialized forum designed specifically to resolve government contract disputes may fulfill the needs for expertise, speed, and uniformity in resolving government contract disputes; (iv) the bankruptcy court may not have authority to grant affirmative relief in excess of the amounts of the claim filed by the Government, and the contract dispute might have to be tried twice; (v) Congress has endorsed the transfer of particular disputes to specialized tribunals. *Bagley,* 990 F.2d at 572. Whether these are the proper and only criteria is an issue not before us, and about which we express no opinion.

16. The factual situation before the bankruptcy court was unusual, if not unique, and involved a contract dispute that had already been before the ASBCA, the decision of which had been reviewed on appeal by this court.

discretion to defer or to determine itself whether the government had a viable claim against the bankruptcy estate." *Id.* The Tenth Circuit held its job was to determine whether the bankruptcy court had abused its discretion, and concluded that it had not.

 We believe the *Bagley* rule, granting some discretion to the bankruptcy court, is better designed than the rule of *Gary Aircraft* to carry out the purposes of the Bankruptcy Act, without necessarily impairing the ability of either the Government or the contractor to obtain a proper resolution of a contract dispute. We hold, as did the Tenth Circuit, that the matter of deferral is committed to the discretion of the district court, which is reviewable for abuse.

 Although we decline to adopt the rule of decision announced by the Fifth Circuit in *Gary Aircraft,* we find that the prudential argument of *Gary Aircraft* retains much force. We agree that "a bankruptcy court should defer a complicated, technical dispute to a specialized forum." *Gary Aircraft,* 698 F.2d at 783. "The bankruptcy court normally supervises the liquidation of claims. But the rule is not inexorable. A sound discretion may indicate that a particular controversy should be remitted to another tribunal for litigation." *Nathanson,* 344 U.S. at 30, 73 S.Ct. at 83 (citations omitted). Government contract law is a specialized, even arcane, field. In many cases, bankruptcy courts should stay their proceedings while the contractual issues are resolved by the Court of Federal Claims, which is accustomed to the intricacies of government contracts.

On the other hand, not all government contracts are complicated or technical, nor are all government contract disputes arcane. Bankruptcy judges are quite competent to decide contract disputes, including disputes that happen to arise from government contracts. In the absence of an absolute rule of decision, bankrupt estates whose assets include contractual claims involving the Federal Government present district court judges with another issue over which they must exercise their discretion: should they decide the contractual claims, or should they stay the bankruptcy proceedings and transfer the contractual issues to the Court of Federal Claims for resolution?

It is likely that, by and large, the latter course is preferable. There may be times, however, when transfer of a relatively straightforward contract claim would cause substantial losses to the creditors of the bankrupt estate, while resolution of the claim would do no harm to the fabric of government contracting law. The newly-enacted provision of the CDA, 41 U.S.C. § 609(f), discussed above, for obtaining an advisory opinion from a board of contract appeals may assist the district courts in resolving these government contract disputes, and thus enlarge the number of cases in which transfer to the Court of Federal Claims will not be necessary.

 With regard to the integrity of that fabric, we note that the bankruptcy court is a court of equity rather than law. "[T]his Court has held that for many purposes 'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity.'" *Pepper v. Litton,* 308 U.S. at 304, 60 S.Ct. at 244 (holding, in circumstances of case, that *res judicata* did not bar equitable powers of bankruptcy court) (citations omitted). The precedential effect of the bankruptcy court's actions on government contract law is circumscribed by its character as a court of equity. If the interest expressed by the Bankruptcy Act in providing fair and expeditious relief to creditors is greater than the interest expressed by the CDA in resolving government contract claims in familiar, and expert, fora, then the district court may, in its discretion, retain jurisdiction over the contract claims.

Thus, although jurisdictional and sovereign immunity concerns fall short of requiring the transfer of government contract disputes from a district court sitting in bankruptcy to the Court of Federal Claims, prudence will often counsel such a transfer. In a memorandum opinion, the District Court invited our review of its decision not to transfer Quality's contract claims back to the Court of Federal Claims. The memorandum opinion was concerned with whether or not the court *could* refuse the Government's motion to

transfer the case, and gave scant attention to *why* the court has chosen to refuse the motion. Consequently, we vacate the trial court's denial of the Government's motion to transfer, and remand the case to the District Court for a ruling on whether that court, in light of this opinion, sees fit to retain jurisdiction over Quality's government contract claims. Each party shall bear its own costs.

### VACATED AND REMANDED.

SCHALL, Circuit Judge, dissenting.

The United States has not filed a proof of claim in this bankruptcy proceeding. Neither does Quality have a substantive right enforceable against the United States that arises from the Bankruptcy Code.[1] The issue, therefore, is whether the district court, sitting in bankruptcy, has jurisdiction concurrent with the Court of Federal Claims to hear Quality's claim, where the claim does not come within the terms of the waiver of sovereign immunity provision of the Bankruptcy Code, 11 U.S.C. § 106,[2] and where the Tucker Act, 28 U.S.C. § 1491(a)(1) (1988), in conjunction with § 10(a)(1) of the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 609(a)(1) (Supp.IV 1992), grants jurisdiction to the Court of Federal Claims to adjudicate the claim. The majority answers in the affirmative. I respectfully dissent.

The majority agrees with Quality's argument that the Tucker Act's "waiver of sovereign immunity extends to any court with jurisdiction over a suit on a government contract, in this case the bankruptcy court." Majority op. at 1575. It is true that the Tucker Act contains both a grant of jurisdiction and a waiver of sovereign immunity. *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983).[3] I do not believe, however, that that waiver is enough to give the district court jurisdiction over Quality's CDA claim. I reach this con-clusion based upon principles of sovereign immunity and statutory construction.

### I

"[T]he traditional principle [is] that the Government's consent to be sued must be construed strictly in favor of the sovereign, ... and not enlarge[d] ... beyond what the language [of the statute] requires...." *United States v. Nordic Village, Inc.,* 503 U.S. 30, 32–36, 112 S.Ct. 1011, 1014–15, 117 L.Ed.2d 181 (1992) (quoted sources omitted). Thus, a waiver must be "unequivocally expressed" in the statute. *Id.* at 33, 112 S.Ct. at 1014 (quoting *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990) (quoting *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607 (1980), and *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502–03, 23 L.Ed.2d 52 (1969))). This is a rule of statutory construction, 503 U.S. at 34–36, 112 S.Ct. at 1015, which guides not only the courts, but also Congress. I agree with the majority that *Nordic Village* is not controlling on the narrow issue before this court; nevertheless, it sets forth the guiding principles upon which this case should be decided.

The concept of a waiver of sovereign immunity being forum specific is not new. In *Minnesota v. United States,* 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235 (1939), the Supreme Court addressed the issue of whether the courts of the State of Minnesota had jurisdiction over a condemnation proceeding involving Indian lands, when the United States was an indispensable party defendant. Minnesota's substantive right to obtain a judgment against the United States arose from a statute which provided: "[L]ands allotted in severalty to Indians [in which the United States had an interest] may be condemned for any public purpose under the laws of the State or Territory where located in the same manner as land owned in fee may be condemned, and

---

1. Quality's claim is not, for example, a claim under 11 U.S.C. § 549(a), seeking to avoid an unauthorized, post-petition transfer of funds from the estate in bankruptcy to the government.

2. Congress amended § 106 in the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 113, 108 Stat. 4106, 4117–18. Unless otherwise not-ed, references to § 106 are to the section as amended by the 1994 Act.

3. The CDA also contains a waiver of sovereign immunity. *Cosmic Constr. Co. v. United States,* 697 F.2d 1389, 1390 (Fed.Cir.1982).

the money awarded as damages shall be paid to the allottee." Act of March 3, 1901, ch. 832, § 3, 31 Stat. 1058, 1083–84. Although the Court was of the opinion that this "authorization to condemn confer[red] by implication permission to sue the United States," 305 U.S. at 388, 59 S.Ct. at 295, it rejected the State's argument that the permission extended to suits in Minnesota state courts, *id.* at 389–90, 59 S.Ct. at 295–96. Instead, it held that the waiver of sovereign immunity was limited to suit in federal district court. *Id.* at 389, 59 S.Ct. at 295–96. The Court stated that "it rests with Congress to determine not only whether the United States may be sued, but in what courts the suit may be brought," *id.* at 388, 59 S.Ct. at 295, and it pointed out that the statute at issue related to Indian lands under trust allotments and that the judicial determination of controversies concerning such lands "ha[d] been commonly committed exclusively to federal courts," *id.* at 389, 59 S.Ct. at 295–96 (footnote omitted).

The Supreme Court had occasion to consider the waiver of sovereign immunity issue again in *United States v. Shaw*, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940). In that case, the United States filed in Michigan probate court a judgment it had obtained in federal court against the administrator of a decedent's estate for damages arising from an act of conversion by the decedent. The probate court allowed the claim and denied an attempt by the administrator to set-off against the judgment in favor of the United States a judgment against the decedent for which the United States had assumed liability. On appeal, the county circuit court held that the set-off was proper to the extent of extinguishing the claim of the United States. That decision was affirmed on appeal by the Michigan Supreme Court and the case was remanded to the probate court for further proceedings. *In re McLouth's Estate*, 281 Mich. 191, 274 N.W. 759, 766 (1937). On remand, the administrator of the estate petitioned the probate court to allow, as a claim in favor of the estate, the amount by which the judgment for which the United States had assumed liability exceeded the judgment in favor of the United States. The probate court granted the petition and allowed the

claim, and the decision was affirmed by the county circuit court. On appeal, the Michigan Supreme Court also affirmed. *In re McLouth's Estate*, 290 Mich. 311, 287 N.W. 477, 484 (1939). In so doing, the court rejected the argument of the United States that the probate court lacked jurisdiction to enter an affirmative money judgment against it. The basis for this argument was the contention that the United States could not be sued without the express consent of Congress and that such consents were jurisdictional and were to be strictly construed. *Id.* 287 N.W. at 481–83.

The Supreme Court granted *certiorari.* The Court framed the issue before it as follows:

> Whether that jurisdiction [jurisdiction in the probate court with respect to an affirmative claim against the United States] exists depends upon the effect of the voluntary submission to the Michigan court by the United States of its claim against the estate. As a foundation for the examination of that question we may lay the postulate that without specific statutory consent, no suit may be brought against the United States. No officer by his action can confer jurisdiction. Even when suits are authorized they must be brought only in designated courts.

309 U.S. at 500–01, 60 S.Ct. at 661 (footnotes omitted). The Court pointed out that, by statute, cross-claims against the United States, up to the amount of the government's claim, were allowed in cases where the government voluntarily sued. *Id.* at 501, 60 S.Ct. at 661. It also pointed out that "[s]pecially designated claims against the United States may be sued upon in the Court of Claims or the district courts under the Tucker Act." *Id.* (footnote omitted). The Court stated, however, that it was not its "right to extend the waiver of sovereign immunity more broadly than has been directed by the Congress." *Id.* at 502, 60 S.Ct. at 662. It concluded: "Against the background of complete immunity we find no Congressional action modifying the immunity rule in favor of cross-actions beyond the amount necessary as a set-off." *Id.* Accordingly, the Court reversed the decision of the Michigan Su-

preme Court. *See also Hahn v. United States*, 757 F.2d 581, 586 (3d Cir.1985) ("It is uniformly held that, for claims exceeding $10,000, the Tucker Act vests *exclusive* jurisdiction in the Claims Court ... even if such claims could be brought within the terms of some other jurisdictional grant, such as 28 U.S.C. § 1331.... This is because it is only under the terms of the Tucker Act that the United States waives its sovereign immunity to such claims, and this consent to suit is a jurisdictional prerequisite." (emphasis in original)); *In re Prudential Lines, Inc. (Prudential Lines, Inc. v. United States Maritime Admin.)*, 79 B.R. 167, 182 (Bankr. S.D.N.Y.1987) ("The Tucker Act's waiver of sovereign immunity is inextricably tied to its jurisdictional terms.").

While it is true that the doctrine of sovereign immunity has its critics, *see, e.g., Nordic Village*, 503 U.S. at 42–46, 112 S.Ct. at 1019–21 (Stevens, J., dissenting), the doctrine still stands. Within this context, I believe that we must continue to follow the principle that the government's consent to be sued "must be construed strictly in favor of the sovereign, ... and not enlarge[d] ... beyond what the language [of the statute] requires," *Nordic Village*, 503 U.S. at 34, 112 S.Ct. at 1015, and the rule that flows from that principle— that "when suits are authorized they must be brought only in designated courts," *Shaw*,

309 U.S. at 501, 60 S.Ct. at 661.[4] Accordingly, I believe that we may hold that the district court has jurisdiction in this case only if we are able to conclude that Congress has so provided by statute. For the following reasons, I am unable to reach that conclusion.

## II

Congress has specifically limited the government's exposure to suit in bankruptcy court to the express waivers of immunity contained in 11 U.S.C. § 106. Section 106 effects waivers in three situations. First, as was clarified in the Bankruptcy Reform Act of 1994, § 106(a) waives sovereign immunity where the substantive authority for the cause of action arises from the Bankruptcy Code itself.[5] Second, § 106(b) waives sovereign immunity for compulsory counterclaims against government claims.[6] Third, § 106(c) waives sovereign immunity for permissive counterclaims capped by a set-off limitation.[7]

Nowhere in the Bankruptcy Code does one find the language which I believe is necessary in order for one to conclude that Congress has conferred upon the district courts jurisdiction over a contractor's CDA claim when the government has not asserted a claim in the bankruptcy proceeding. In this regard, the enactment of the 1994 Act is

4. This court has stated that "waivers of sovereign immunity are to be construed in favor of the government," *M.A. Mortenson Co. v. United States*, 996 F.2d 1177, 1180 (Fed.Cir.1993), and that "great care must be taken not to expand liability [of the United States] beyond that which was explicitly consented to by Congress." *Fidelity Constr. Co. v. United States*, 700 F.2d 1379, 1387 (Fed.Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983).

5. In this regard, the 1994 Act changed the statute so as to compel a result different from the one reached in *Nordic Village*. In that case, the bankruptcy trustee commenced an action against the United States, contending that an unauthorized, post-petition transfer of funds from the estate to the government could be avoided under 11 U.S.C. § 549(a) and the funds recovered from the government under 11 U.S.C. § 550(a). 503 U.S. at 30–32, 112 S.Ct. at 1013. The Court, however, held that 11 U.S.C. § 106(c) (1988) did not unambiguously waive the government's sovereign immunity from the trustee's claim. 112 S.Ct. at 1015–16. In the 1994 Act, § 106(c) was

recodified at § 106(a) and was amended to provide unambiguously that "sovereign immunity is abrogated as to a governmental unit ... with respect to ... Sections ... 549, 550 ... of this title." 11 U.S.C. § 106(a)(1); *see also* H.R.Rep. No. 835, 103d Cong., 2d Sess. 42 (1994) U.S.C.C.A.N. pp. 3350, 3351 ("This section would effectively overrule two Supreme Court cases", one of which was *Nordic Village*.).

6. Section 106(b) provides that "[a] governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose."

7. Section 106(c) provides that "[n]otwithstanding any assertion of sovereign immunity by a governmental unit, there shall be offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate."

significant. When Congress enacts legislation, it is presumed to know the pertinent law. *See Cannon v. University of Chicago,* 441 U.S. 677, 699, 99 S.Ct. 1946, 1958, 60 L.Ed.2d 560 (1979) ("[I]t is not only appropriate but also realistic to presume that Congress was thoroughly familiar with these unusually important precedents [regarding implied private rights of action] and that it expected its enactment to be interpreted in conformity with them."). That means that, when it enacted the amendments to § 106 cited above, Congress is presumed to have known the law relating to sovereign immunity, including the principle that waivers of sovereign immunity are to be strictly construed in favor of the government and not enlarged beyond statutory terms. *See* H.R.Rep. No. 835, 103d Cong., 2d Sess. 42 (1994) U.S.C.C.A.N. pp. 3350, 3351 ("This amendment [to 11 U.S.C. § 106] *expressly* provides for a waiver of sovereign immunity...." (emphasis added)). Under these circumstances, I am constrained to conclude that, by not going beyond the point it did in amending § 106, Congress evinced an intent not to confer upon the district courts jurisdiction to adjudicate claims like Quality's. *See United States v. International Business Machs. Corp.,* 892 F.2d 1006, 1009 (Fed.Cir. 1989) ("Had Congress intended to make the exemptions permanent, it knew how; it could and we believe would have used words of futurity....").

### III

The majority states that "[t]he Tucker Act waives the government's immunity from suit on its contracts in any court to which congress grants jurisdiction to hear the claim." Majority op. at 1575–76. Most respectfully, I disagree for two reasons. First, it seems to me that it is in the language of the Bankruptcy Code that we must find the required waiver of sovereign immunity. As just discussed, I am unable to find such a waiver. In addition, I do not believe that the cases upon which the majority relies support its position. In *United States v. Mitchell,* 463 U.S. at 212, 103 S.Ct. at 2965, the suit against the government was brought in the forum specified in the statute that effected the waiver of sovereign immunity (Tucker

Act case, brought in the Court of Claims), while *Franchise Tax Board of California v. United States Postal Service,* 467 U.S. 512, 515, 104 S.Ct. 2549, 2551, 81 L.Ed.2d 446 (1984), and *Keifer & Keifer v. Reconstruction Finance Corp.,* 306 U.S. 381, 392, 59 S.Ct. 516, 519, 83 L.Ed. 784 (1939), both involved "sue and be sued" clauses that did not limit where the federal government entity could be sued. I do not believe that, in the face of the law of sovereign immunity and the absence of necessary language in the Bankruptcy Code, these cases are adequate to the task of carrying one from Point A (the forum-specific waiver of sovereign immunity in the Tucker Act) to Point B (the conclusion that the district court has concurrent jurisdiction with the Court of Federal Claims over Quality's CDA claim).

Finally, I believe that one additional point should be noted. In my view, the implications inherent in the majority opinion are also pertinent in seeking to determine whether Congress intended the waiver of sovereign immunity which the majority has found. It seems to me that the conclusion which flows logically from the majority opinion is that, in bankruptcy cases with facts similar to those here, the district courts have concurrent jurisdiction with the Court of Federal Claims over the kinds of claims that are traditionally brought in that court; for example, claims involving an alleged taking of property by the government in violation of the Fifth Amendment of the Constitution, *see, e.g., United States v. Causby,* 328 U.S. 256, 267, 66 S.Ct. 1062, 1068–69, 90 L.Ed. 1206 (1946); military pay claims, *see, e.g., Matias v. United States,* 923 F.2d 821, 823 (Fed.Cir.1990); and claims asserting an entitlement to money under a federal statute or regulation, *see, e.g., Rogers v. Ink,* 766 F.2d 430, 436 (10th Cir.1985) (directing the transfer of a claim of statutory entitlement to federal funds to the United States Claims Court), *cert. denied following post-transfer adjudication,* 490 U.S. 1034, 109 S.Ct. 1930, 104 L.Ed.2d 403 (1989). When the amount in controversy has exceeded $10,000, pursuant to the Tucker Act, such cases have come under the exclusive jurisdiction of the Court of Federal Claims or its predecessors. Congress certainly could change all this, but the change

would be radical. For this reason, I believe that before we effectively hold that there has been such a change, we must find clear and unambiguous language. I am unable to find such language.

## IV

For the foregoing reasons, I would hold that the United States District Court for the Northern District of Alabama lacks jurisdiction in this matter. Accordingly, I would reverse the decision below and transfer the case to the Court of Federal Claims.