**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JERRY MCGUIRE,
        *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,
        *Defendant-Appellee.*

No. 06-15812

D.C. No.
CV-05-02694-JAT

OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted
February 15, 2008—San Francisco, California

Filed December 24, 2008

Before: Sidney R. Thomas and Jay S. Bybee, Circuit Judges,
and Frederic Block,* District Judge.

Opinion by Judge Thomas

*The Honorable Frederic Block, Senior United States District Judge for the Eastern District of New York, sitting by designation.

16737

## COUNSEL

Robert M. Cook; Phoenix, Arizona; David A. Domina and James F. Cann, Omaha, Nebraska, for the appellant.

Sue Ellen Wooldridge, Assistant Attorney General, Richard G. Patrick, Assistant U.S. Attorney, Phoenix, Arizona; Elizabeth A. Peterson, Katherine J. Barton, Attorneys, Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the appellee.

## OPINION

THOMAS, Circuit Judge:

This appeal presents the question of whether district courts have jurisdiction to entertain a bankruptcy debtor's Tucker Act claims. We conclude that the Tucker Act's sovereign immunity waiver is limited to suits filed in the United States Court of Federal Claims. We reverse the judgment of the district court and remand with instructions to transfer the action to the Court of Federal Claims, which is the appropriate venue for takings claims in excess of $10,000.

I

Jerry McGuire is an experienced farmer with a degree in agronomy and agricultural economics from the University of Arizona. In 1994, McGuire entered into a lease with the Colorado River Indian Tribe ("the Tribe") for 1,355.97 acres of farmland ("Leased Property") on the Tribe's reservation near Parker, Arizona. The lease was for a ten-year period commencing on January 1, 1995 and expiring on December 31, 2004. McGuire was required to pay the Tribe $226,411.92 per year, subject to an appraisal for the years 2000 through 2004. Because the Leased Property was land held in trust for the Tribe by the United States, the lease required the approval of the United States Bureau of Indian Affairs ("BIA"). Allen Anspach, Superintendent of the Colorado River Agency of the BIA, approved the lease on June 13, 1996.

A BIA canal running east to west bisected the Leased Property, dividing the property into a northern half and southern half. At the time the lease was executed, a bridge crossed the BIA canal providing access to the north portion of the property from Mohave Road, the main road that runs from Parker, Arizona to Interstate Highway 10. The bridge was constructed by a former tenant sometime in the 1960's and was made of wood with round concrete piers or bulkheads underneath. The bridge provided the most common and easiest access to the northern portion.

McGuire planted and maintained alfalfa on most of the Leased Property. McGuire made substantial investments towards harvesting the alfalfa crop, purchasing tractors, other farming equipment, trucks, seed, labor, laser leveling, tillage, herbicides and fertilizer. In total, McGuire invested roughly $1,225,300 at the outset of the lease. McGuire acquired a long-term and short-term/revolving loan to finance his investments. From 1995 through 1999, McGuire timely paid his lease payment and water bills every year.

In summer 1998, Anspach verbally informed McGuire that the BIA was going to remove the bridge because it was unsafe. On December 9, 1998, after meeting with McGuire, the Tribe sent a letter to the BIA stating that removal of the bridge would severely limit access to farming lands and decrease the value of the land. The Tribe asked for time to work out a solution. The Tribe sent a second letter on December 23, 1998 asking the BIA to explore alternatives to removing the bridge because the tenants needed the bridge to access the farm land.

Anspach replied to the Tribe on December 24, 1998. Anspach stated that the bridge would be removed in early 2000 because the bridge was not legally authorized under 25 C.F.R. § 171.9 and because the BIA believed the bridge was unsafe. Anspach recommended that the farmers either reroute access or develop a new bridge approved by the BIA. On February

5, 1999, Anspach sent the first of three letters to McGuire giving him written notice that the bridge would be removed in January 2000 because it was deemed to be unsafe and unauthorized. The letter stated:

> "If you should decide that you need to bridge the canal in order to operate your farm you may submit to the Agency Superintendent plans, with specifications, for a new bridge and apply for a crossing permit. See attached; Reference to 25 CFR, Ch. 171.9 Structures."

A copy of the regulations was included with the letter. Anspach directed McGuire to contact Ted Henry, Irrigation Systems Manager, if he had any questions.

During 1999, McGuire contacted Henry and Jeff Hinkins, Supervisory General Engineer, and discussed the bridge with them on several occasions. At trial, McGuire recounted one instance in which he drew a sketch of a design for a new bridge with Hinkins, and Hinkins said he was going to discuss it with Anspach. McGuire was told on several occasions by BIA staff that any decision concerning the bridge could only be made by Anspach. McGuire called Anspach throughout the year, but never spoke with Anspach or received a return phone call from him. During this time, BIA staff never provided McGuire with a permit form or formal application for a bridge permit.

In October 1999, McGuire retained local counsel and filed a complaint in tribal court against BIA for the impending removal of the bridge. The complaint alleged that removal of the bridge would be illegal, would breach the lease between McGuire and the Tribe and would take his leasehold. The BIA declined to appear in tribal court. McGuire also appealed Anspach's decision within the BIA to the Western Regional Office, which upheld Anspach's decision. McGuire did not take the appeal any higher within the BIA.

Anspach sent McGuire two additional letters on August 25, 1999 and November 12, 1999 stating that the bridge would be removed in January 2000 and that McGuire could apply for a permit for a new bridge in accordance with 25 C.F.R. § 171.9. On November 12, 1999 — the same date as Anspach's last letter to McGuire — the BIA blocked the bridge. The bridge was dismantled and removed in January 2000.

Although the northern portion of the Leased Property could be reached by a few other routes, none were reasonable means of access for McGuire's farming equipment. McGuire and his haulers attempted to access the northern portion in a variety of ways, but none proved successful. McGuire subsequently tried to renegotiate the lease with the Tribe, but the Tribe was unwilling to lower the lease payment or decrease the amount of Leased Property to only include the southern portion. McGuire could not generate enough revenue to make the lease payment from the income from the southern portion alone, and defaulted on his lease in 2000.

McGuire filed for Chapter 11 bankruptcy relief on June 5, 2001. On November 13, 2001, he filed this inverse condemnation action against the United States in bankruptcy court, seeking $2 million in compensation.[1] The United States moved to dismiss for lack of jurisdiction on sovereign immunity grounds. On December 9, 2002, the bankruptcy court issued "Findings and Recommendations." The court held that the Tucker Act, 28 U.S.C. § 1491, waived the government's immunity to suit in district court, relying on the Federal Circuit's decision in *Quality Tooling v. United States*, 47 F.3d 1569 (Fed. Cir. 1995). The court found that it should maintain jurisdiction over the action in the interests of judicial economy and not unduly burdening McGuire. Finally, the court

---

[1]McGuire's complaint originally included several additional claims and defendants, but he proceeded only under the inverse condemnation theory. The United States was substituted as the sole defendant, replacing the other defendants named in the complaint.

held that the proceeding was not a "core proceeding" and therefore it should report its findings and recommendations to the district court for action under 28 U.S.C. § 157(c). On July 11, 2003, the district court adopted the bankruptcy court's "Findings and Recommendations" and denied the United States' motion to dismiss.

The district court remanded the case to bankruptcy court for trial, which was conducted on April 14 and 15, 2005. Following trial, the bankruptcy court issued "Proposed Findings of Fact and Conclusions of Law," in which the court found that the United States had committed a regulatory taking of McGuire's leasehold interest and recommended an award of $1,132,059.60 in damages — the fair market value of the lease on the entire property for the remaining five years of the lease.

The district court rejected the bankruptcy court's recommendations. The court agreed with the bankruptcy court that the government's actions could qualify as a "regulatory taking," but held that McGuire's claim was not ripe for review because the government never denied an application for a permit to construct a new bridge. This timely appeal followed.

We review the district court's conclusions of law *de novo* and its findings of fact for clear error. *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir. 2000). We review jurisdictional issues in bankruptcy *de novo*. *In re Mantz*, 343 F.3d 1207, 1211 (9th Cir. 2003).

II

**[1]** The district court erred in holding that McGuire's takings claim was not ripe for review because he never applied for a permit to develop a new bridge. The Supreme Court has held that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations

has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985). A court must know "the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." *MacDonald v. County of Yolo*, 477 U.S. 340, 351 (1986). Until a property owner obtains a final decision from the government, " 'it is impossible to tell whether the land [retains] any reasonable beneficial use or whether [existing] expectation interests [have] been destroyed.' " *MacDonald*, 477 U.S. at 349 (quoting *Williamson Planning Comm'n*, 473 U.S. at 190 n. 11). Additionally, because "the very existence of a permit system implies that permission may be granted," "[o]nly when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred." *United States v. Riverside Bayview Homes*, 474 U.S. 121, 127 (1985).

[2] To the extent that the ripeness requirements developed in these land use development cases apply to the case at bar,[2] we hold that McGuire's takings claim is ripe because he sufficiently complied with the permitting system as practiced by the BIA. BIA regulations in effect at the time permitted a private party to apply for a permit to build a bridge or crossing for private use at the party's own expense by obtaining the approval of the "Officer-in-Charge." 25 C.F.R. § 171.9(c) (1999). The BIA sent three letters to McGuire prior to the removal of the bridge, all of which informed McGuire that he could apply for a permit by submitting "plans, with specifications, for a new bridge and apply for a crossing permit" to Anspach. However, in practice, the Colorado River Agency of the BIA did not follow a formal permitting process. At trial,

---

[2]We note that the government's argument that McGuire was required to submit a formal permit application might be better characterized as an exhaustion argument or a defense to liability. Regardless of how the objection is characterized, it is clear that McGuire sufficiently complied with BIA practice and the objection is without merit.

Anspach explained that a property owner who wants to put in a bridge typically approaches the BIA and says:

> "We'd like to put a bridge here. And can you help us come up with some plans and specs?" Or "Here are my proposed plans and specs. What do you think?" And then we have our engineers and staff look at it and go from there.

Anspach testified that he had never personally received a written proposal during his tenure at the BIA.

**[3]** McGuire followed the prevailing practice by contacting the BIA on a number of occasions during 1999. Following the instructions in the BIA's letters, McGuire discussed the bridge removal and plans for a new bridge several times with Henry and Hinkins. McGuire testified that on one occasion he drew a sketch of a design for a new bridge with Hinkins. McGuire repeatedly attempted to reach Anspach by phone, but never received a call back.

During this time, McGuire tried a variety of additional strategies to maintain access to the Leased Property: he enlisted the help of the Tribe, who sent two letters to the BIA on McGuire's behalf requesting that the BIA not remove the bridge and try to work out an alternative solution; he retained local counsel and filed suit against the BIA in tribal court, but the BIA declined to appear; and he appealed Anspach's decision to the Western Regional Office of the BIA, which upheld Anspach's decision. In short, McGuire did everything reasonably within his power to prevent removal of the bridge and, when those efforts proved ineffective, to build a new one.

**[4]** The government's position thus amounts to the claim that the mere fact McGuire did not submit a formal application for a bridge permit renders his takings claim unripe. However, "[r]ipeness doctrine does not require a landowner to submit applications for their own sake." *Palazzolo v. Rhode*

*Island*, 533 U.S. 606, 622 (2001). Here, McGuire took "reasonable and necessary steps to allow" the BIA to exercise its "full discretion in considering development plans for the property." *Id.* at 620-21. No further purpose would have been served by filing a formal application for a bridge permit. Accordingly, McGuire's takings claim is ripe for review.**³**

## III

Although McGuire's suit is ripe for adjudication, the doctrine of sovereign immunity bars the district court and bankruptcy courts from hearing the merits of his takings claim.

**[5]** "It is well settled that the United States is a sovereign, and, as such, is immune from suit unless it has expressly waived such immunity and consented to be sued. Such waiver cannot be implied, but must be unequivocally expressed. Where a suit has not been consented to by the United States, dismissal of the action is required . . . . [because] the existence of such consent is a prerequisite for jurisdiction." *Gilbert v. Da Grossa*, 756 F.2d 1455, 1458 (9th Cir. 1985) (internal quotation marks and citations omitted). Unless McGuire "satisfies the burden of establishing that its action falls within an unequivocally expressed waiver of sovereign immunity by Congress, it must be dismissed." *Dunn & Black v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007).

---

**³**Although we conclude in Section II that sovereign immunity barred the district and bankruptcy courts from hearing the merits of the claim, we reach the question of ripeness because we consider it a predicate to transferring the case to the Court of Federal Claims, as we do in Section V. *See Hose v. INS*, 180 F.3d 992, 995-96 (9th Cir. 1999) (en banc) ("In order for a case to be transferred pursuant to the federal transfer statute, the transferee court must be able to hear the matter upon transfer."). Although the ripeness question in this case is arguably prudential, rather than jurisdictional, judicial economy and courtesy to transferee courts dictates that we resolve threshold issues first before invoking the transfer statute. This consideration is particularly applicable in this case because ripeness formed the basis of the district court's decision, and it would be inappropriate to transfer a case that we did not consider ripe for adjudication.

**[6]** Whether the district court had jurisdiction over McGuire's takings claim requires us to consider the two principal federal statutes authorizing suit against the United States: the Tucker Act and the Little Tucker Act. The Tucker Act provides a waiver of sovereign immunity and for jurisdiction in the Court of Federal Claims for certain claims brought against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Little Tucker Act provides a waiver of sovereign immunity and for concurrent district court jurisdiction over:

> [a]ny . . . civil action or claim against the United States, not exceeding $ 10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1346(a)(2). Read together, these statutes provide for jurisdiction solely in the Court of Federal Claims for Tucker Act claims seeking more than $10,000 in damages, and concurrent district court jurisdiction over claims seeking $10,000 or less. *United States v. Hohri*, 482 U.S. 64, 67 n.1 (1987). "The legislative intent in granting concurrent district court jurisdiction over claims of less than $10,000 was to relieve small claimants of the expense of traveling to Washington, D.C., to litigate before the Court of Federal Claims,

while large claims remained centralized at the seat of the government so that department heads would be better able to protect the government's interests." Moore's Federal Practice 3d § 105.25[1][a]; *Shaw v. Gwatney*, 795 F.2d 1351, 1355-56 (8th Cir. 1986).

**[7]** McGuire's takings claim falls within the scope of the Tucker Act. A takings claim is the type of claim founded on the Constitution for which the Tucker Act grants jurisdiction in the Court of Federal Claims. *Eastern Enters. v. Apfel*, 524 U.S. 498, 520 (1998) ("[A] claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute."); *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 126 (1974); *United States v. Causby*, 328 U.S. 256, 267 (1946) ("If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine."). McGuire claimed $2,000,000 in damages, well in excess of the $10,000 jurisdictional amount. Thus McGuire could have brought his takings claim in the Court of Federal Claims.

**[8]** But that is not the end of our inquiry, as a claim that falls under the Tucker Act does not necessarily have to be brought in the Court of Federal Claims. The Tucker Act's grant of jurisdiction to the Court of Federal Claims is frequently referred to as "exclusive," but "that court's jurisdiction is 'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court." *Bowen v. Massachusetts*, 487 U.S. 879, 910 n.48 (1988). "[C]ourts have referred to the Tucker Act's grant of exclusive jurisdiction as a shorthand way of recognizing that Congress has waived sovereign immunity for [authorized] claims only for actions brought in the Court of Federal Claims." *Doe v. Tenet*, 329 F.3d 1135, 1141 n.3 (9th Cir. 2003), *rev'd on other grounds*, 554 U.S. 1 (2005). " '[J]urisdiction under the Tucker Act is not exclusive

where other statutes independently confer jurisdiction and waive sovereign immunity.' " *In re Liberty Constr.*, 9 F.3d 800, 801 (9th Cir. 1993) (quoting *Pacificorp v. Federal Energy Regulatory Comm'n*, 795 F.2d 816, 826 (9th Cir. 1985) (Wallace, J., concurring)).

**[9]** Thus, the Tucker Act does not preclude district court jurisdiction over McGuire's takings claim, so long as there is an independent waiver of sovereign immunity and grant of federal district court jurisdiction. The statutory basis for federal district court jurisdiction in this case is founded not on the Tucker Act, but on the Bankruptcy Code. The Bankruptcy Code provides:

> . . . notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C. § 1334(b). A civil proceeding is "related to" a title 11 case if "the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988) (emphasis removed) (internal quotations and citation omitted). McGuire's takings claim undisputably falls under this broad grant of jurisdiction.

**[10]** While § 1334(b) provides a statutory basis for district court jurisdiction in this case, there is no corresponding statute that provides a waiver of sovereign immunity. The district court held that the Tucker Act provided the government's consent to suit in district court, relying primarily on *Quality Tooling v. United States*, 47 F.3d 1569 (Fed. Cir. 1995). There, the Federal Circuit held that a bankruptcy debtor[4]

---

[4]Quality Tooling brought a contract claim against the United States, pursuant to the Tucker Act and Contract Disputes Act of 1978, 41 U.S.C.

could bring a contract claim against the federal government in a district court sitting in bankruptcy because the Tucker Act broadly "waives the government's immunity from suit on its contracts in any court to which Congress grants jurisdiction to hear the claim." *Id.* at 1575. Because § 1334(b) "give[s] the district court sitting in bankruptcy plenary authority over the bankrupt's estate and all claims by or against it," *id.* at 1573, the Federal Circuit concluded that the district court could properly exercise jurisdiction over the contract dispute.

[11] We cannot agree that the Tucker Act generally waives sovereign immunity for suits outside the Court of Federal Claims. The Tucker Act provides that the "Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution . . . ." 28 U.S.C. § 1491(a)(1). The Supreme Court has required that "[a] waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (internal citations omitted). Additionally, "the Government's consent to be sued must be construed strictly in favor of the sovereign, and not enlarged . . . beyond what the language requires." *United States v. Nordic Village*, 503 U.S. 30, 34 (1992) (internal quotations and citations omitted). Here, the statutory text of the Tucker Act is far from an "unequivocal expression" of consent to suit in federal district court. Indeed, if anything, the Tucker Act unequivocally limits claims like McGuire's to the Court of Federal Claims.

[12] This view is reinforced by the language in the Little Tucker Act that expressly provides for federal district court

§ 609, in the Court of Federal Claims. *Id.* at 1571. While the claim was pending, Quality petitioned for Chapter 11 relief. Quality's contract claim was subsequently moved to the Northern District of Alabama, sitting in bankruptcy. After the government's motion to transfer the contract dispute back to the Court of Federal Claims was denied, the Federal Circuit entertained the government's interlocutory appeal pursuant to 28 U.S.C. § 1292(d)(4). *Id.* at 1571-72.

jurisdiction over Tucker Act claims for $10,000 or less. The Little Tucker Act "effects . . . [an] explicit waiver" of sovereign immunity to such suits in district court. *Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 734 (1982). The express inclusion of concurrent district court jurisdiction in the Little Tucker Act suggests that Congress intended to preclude district court jurisdiction over claims in excess of $10,000.

The inclusion of specific waivers of sovereign immunity in the Bankruptcy Code buttresses our conclusion. Section 106 of the Bankruptcy Code waives the federal government's sovereign immunity in three circumstances: (1) where the substantive authority for the cause of action arises from the Bankruptcy Code itself; (2) for compulsory counterclaims against government claims; and (3) for permissive counterclaims capped by a set-off limitation. *See* 11 U.S.C. § 106(a)-(c); *Quality Tooling*, 47 F.3d at 1583 (Fed. Cir. 1995) (Schall, J., dissenting). The district court did not find a waiver of sovereign immunity based on any of these provisions, nor does it appear that any apply to McGuire's takings claim. The express, specific waivers in § 106 suggest that Congress did not intend to broadly consent to suit in bankruptcy court for any claim that falls under the Tucker Act. Additionally, these express waivers would be unnecessary if Congress, through the Tucker Act, broadly consented to suit in federal district court.

We also observe that *Quality Tooling* is at odds with Congress' intent in creating the Federal Circuit to address the "special need for nationwide uniformity" in areas of law encompassed by the Tucker Act. *Hohri*, 482 U.S. at 71 (internal quotations and citation omitted). While the Little Tucker Act permits suits in district court for damages claims of $10,000 or less, an appeal on such claims is assigned to the Federal Circuit — the same court that hears appeals of Tucker Act claims from the Court of Federal Claims. *See* 28 U.S.C. § 1295(a)(2). "A conspicuous feature of these judicial

arrangements is the creation of exclusive Federal Circuit jurisdiction over *every appeal* from a Tucker Act or nontax Little Tucker Act claim." *Hohri*, 482 U.S. at 72-73. Thus *Quality Tooling* is contrary to Congress' goal of creating uniformity in the law that affects the federal government (although, admittedly, this concern does not apply with much force to claims like McGuire's, which are frequently brought in district court outside the bankruptcy context).

There is nothing unusual about our conclusion that the Tucker Act effects a limited waiver of sovereign immunity in the Court of Federal Claims. In other contexts, the Supreme Court has recognized that a waiver of sovereign immunity can be forum-specific: "[I]t rests with Congress to determine not only whether the United States may be sued, but in what courts the suit may be brought." *Minnesota v. United States*, 305 U.S. 382, 388 (1939); *see also Hercules, Inc. v. United States*, 516 U.S. 417, 422 (1996) ("The United States, as sovereign, is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.") (internal quotations omitted). In *Minnesota*, 305 U.S. at 389-90, the Supreme Court held that a statute providing that Indian lands in which the United States had an interest could be condemned granted permission for states to sue the United States with respect to such lands, but that the waiver was limited to suit in federal district court. Similarly, in *United States v. Shaw*, 309 U.S. 495, 501-02 (1940), the Supreme Court held that a Michigan probate court did not have jurisdiction over a cross-claim against the United States in an amount greater than necessary as a set-off, which was authorized by statute. The Court observed that a number of policy concerns supported Shaw's position: the preference for a single adjudication, the necessity of a complete examination of the cross-claim, and that the government had voluntarily injected itself into the probate proceeding. *Id.* at 502. It nonetheless concluded that "[i]t is not our right to extend the waiver of sovereign immunity more broadly than has been directed by the Congress." *Id.*;

*see also Quality Tooling*, 47 F.3d at 1581-83 (Schall, J., dissenting) (discussing *Minnesota* and *Shaw* in detail).

**[13]** The *Quality Tooling* majority distinguished *Shaw* and *Minnesota* on the ground that those cases involved the question of state court jurisdiction over the federal government, whereas here both courts involved "are creatures of the federal sovereign." 47 F.3d at 1577. While that distinction may have some relevance to immunity analysis, *see id.* at 1577 n.9, it does not alter the ordinary practice of narrowly construing waivers of immunity. Here, like in *Shaw*, there are a number of practical considerations that weigh in favor of district court jurisdiction over McGuire's takings claim. However, because the government has not unequivocally waived its sovereign immunity to suit in district court for claims like McGuire's, the district court erred by concluding it had jurisdiction to try the merits of the Tucker Act claims.

## IV

**[14]** Our conclusion that the Court of Federal Claims is the proper court to entertain the merits of McGuire's takings claims does not mean that the district and bankruptcy courts have no jurisdictional role. To the contrary, "[t]he district court in which the bankruptcy case is commenced obtains exclusive in rem jurisdiction over all of the property in the estate." *Hong Kong and Shanghai Banking Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 996 (9th Cir. 1998). A chose in action is property of the bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1). *City & County of San Francisco v. PG & E Corp.*, 433 F.3d 1115, 1126 (9th Cir. 2006). For this reason, only bankruptcy trustees, debtors-in-possession, or bankruptcy court authorized entities have standing to sue on behalf of the estate. *Estate of Spirtos v. One San Bernardino County Superior Court Case Numbered SPR 02211*, 443 F.3d 1172, 1175 (9th Cir. 2006). If McGuire had attempted to pursue his takings action in the Court of Federal Claims without bankruptcy court approval, his suit would have been subject

to dismissal for lack of standing. Thus, although the Court of Federal Claims has exclusive jurisdiction to entertain the merits of a Tucker Act claim brought by a bankruptcy debtor, the cause of action belongs to the bankruptcy estate and is subject to bankruptcy court jurisdiction. These circumstances are not unusual. Many state law claims of bankruptcy debtors are litigated outside bankruptcy court. However, in the usual course, any money judgment obtained in such an action is property of the bankruptcy estate. Therefore, although the bankruptcy and district court do not have jurisdiction to hear the merits of the Tucker Act claims, the cause of action still forms part of the bankruptcy estate and the management thereof is subject to bankruptcy court jurisdiction.

## V

The final issue is procedural—whether this action should be dismissed or transferred. If a court lacks jurisdiction over a federal civil action, "the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed." *Puri v. Gonzales*, 464 F.3d 1038, 1042 (9th Cir. 2006) (quoting 28 U.S.C. § 1631). Given the uncontested district court jurisdiction over the bankruptcy, coupled with authority from the Federal Circuit Court of Appeals indicating that the district court had jurisdiction over the Tucker Act claim, we conclude it would be in the interest of justice to transfer the action to the Court of Federal Claims, rather than dismissing it.

**[15]** Therefore, we reverse the judgment of the district court and remand this case with instructions that this action be transferred to the Court of Federal Claims pursuant to 28 U.S.C. § 1631.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**