**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARK MUNNS; CHRISTA MUNNS, administrators for the separate Estate of Joshua Munns; DENNIS DEBRABANDER; SHARON DEBRABANDER, administrators for the separate Estate of John Young; LORI SILVERI, administrator for the separate Estate of John Cote, *Plaintiffs-Appellants*, <br><br> v. <br><br> JOHN F. KERRY, in his official capacity as United States Secretary of State; JENNIFER FOO, in her official capacity; UNITED STATES OF AMERICA; LLOYD'S OF LONDON; CNA FINANCIAL CORPORATION, *Defendants-Appellees*. | No. 12-15969 <br><br> D.C. No. 2:10-cv-00681-MCE-EFB <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., Chief District Judge, Presiding

Argued and Submitted
September 11, 2014—San Francisco, California

Filed March 20, 2015

Before:  Stephen Reinhardt, Raymond C. Fisher
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Fisher;
Concurrence by Judge Reinhardt

## SUMMARY[*]

### Standing / Jurisdiction

The panel affirmed the district court's dismissal of the plaintiffs' equitable claims due to lack of standing and their federal benefits claims due to lack of jurisdiction, and vacated the district court's dismissal of the due process and takings claims for withheld back pay and insurance proceeds in an action brought against United States government officials by family members and a coworker of three Americans who were kidnapped and killed while providing contract security services during the United States military occupation of Iraq.

The panel held that the plaintiffs had not shown that they were likely to be harmed in the future by the United States' policies governing the supervision of private contractors and the response to kidnappings of American citizens in Iraq; and therefore, the plaintiffs lacked Article III standing to seek prospective declaratory and injunctive relief regarding those policies. The panel also held that the plaintiffs failed to allege a governmental waiver of sovereign immunity that would confer jurisdiction in the district court over their

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

monetary claims. Finally, the panel held that the United States Court of Federal Claims had jurisdiction over the plaintiffs' claims for withheld back pay and insurance proceeds, and directed the district court to sever and transfer those claims under 28 U.S.C. § 1631.

Judge Reinhardt concurred, and wrote separately to emphasize that it would not be appropriate for the court to resolve in this case any questions regarding the proper policies for the government to follow with respect to the role of contractors in Iraq, nor determine how the government, or the families of hostages, should deal with terrorist groups who hold hostage United States citizens.

## COUNSEL

William Wayne Palmer (argued), Law Offices of William W. Palmer, Sacramento, California, for Plaintiffs-Appellants.

H. Thomas Byron, III (argued), Michael Raab, Stuart F. Delery, Assistant Attorney General, Joyce R. Branda, Acting Assistant Attorney General, and Benjamin B. Wagner, United States Attorney, United States Department of Justice, Civil Division, Appellate Staff, Washington, D.C., for Defendants-Appellees.

**OPINION**

FISHER, Circuit Judge:

This case arises from the kidnappings and brutal killings of three Americans who were providing contract security services during the United States military occupation of Iraq. The plaintiffs, who include family members and a former coworker of these three men, brought suit against United States government officials to challenge policies governing the supervision of private contractors and the response to kidnappings of American citizens in Iraq ("policy claims"). They also claim the government is withholding back pay, life insurance proceeds and government benefits owed to the families of the deceased contractors ("monetary claims").

The district court dismissed the policy claims for lack of standing and for presenting nonjusticiable political questions. It dismissed the monetary claims for failure to establish a waiver of the government's sovereign immunity from suits for damages and for failure to state a claim for which relief could be granted. We hold that the plaintiffs have not shown they are likely to be harmed in the future by the challenged policies. They therefore lack standing to seek prospective declaratory and injunctive relief regarding those policies. We further hold that the plaintiffs have failed to allege a governmental waiver of sovereign immunity that would confer jurisdiction in the district court over their monetary claims. Finally, we hold that the United States Court of Federal Claims has jurisdiction over the plaintiffs' claims for withheld back pay and insurance proceeds, and we direct the district court to transfer those claims under 28 U.S.C. § 1631. We thus affirm in part and vacate in part and remand.

# BACKGROUND[1]

Plaintiffs Mark Munns, Christa Munns, Dennis DeBrabander, Sharon DeBrabander and Lori Silveri are family members of Joshua Munns, John Young and John Cote, who were kidnapped and tragically killed in Iraq in 2008 while working for a private security firm, Crescent Security (Crescent). Plaintiff Gary Bjorlin was formerly employed by Crescent in Iraq and would like to return to that country as a private security contractor.

In November 2006, while working for Crescent, contractors Munns, Young and Cote were assigned to guard a 46-truck convoy traveling from Kuwait to southern Iraq. The plaintiffs allege that on the day of the convoy, Crescent issued the men substandard military equipment and ordered other security team members not to accompany them on the convoy, and that Iraqi security team members slated to join the convoy failed to show up for work, leaving only seven contractors to guard the convoy. When the convoy stopped at an Iraqi police checkpoint, 10 armed men approached and, along with the Iraqi police, took five of the contractors captive, including Munns, Young and Cote. The men were held for over a year, until their kidnappers brutally executed them sometime in 2008.

The plaintiffs trace the contractors' kidnappings and murders to Crescent's failure to adequately prepare and supervise its personnel in Iraq. They allege Crescent's

---

[1] When reviewing an order granting a motion to dismiss, we accept as true all well-pleaded facts in the complaint. *See OSU Student Alliance v. Ray*, 699 F.3d 1053, 1058 (9th Cir. 2012). The assumed facts in this opinion are based on the plaintiffs' first amended complaint.

deficient conduct was "officially sanctioned" by the Secretary of State through an unlawful order issued by the Coalition Provisional Authority (CPA) overseeing the U.S. occupation. CPA Order 17 allegedly gave "blanket immunity [to contractors] from all prosecution," granting them a "license to kill" with impunity and permitting contractors to "circumvent the authority of Congress, the Courts, and the Constitution."[2]  Additionally, the plaintiffs say they heard rumors that CPA Order 17, and the consequent lawless behavior of some security contractors, may have been the motivation behind the kidnappings.

Plaintiff Bjorlin wants to know whether CPA Order 17, or a similar policy, will be in effect if he returns to Iraq as a security contractor, as he says he would like to do.  He asserts it is foreseeable that whatever employer he might contract with will again make assurances about safe working conditions, but that he cannot know if those assurances will be honored because the U.S. government has previously failed to hold its contractors legally accountable.   He contends that CPA Order 17's alleged grant of blanket immunity from prosecution exceeded the executive branch's constitutional authority.  Accordingly, he asks the court to declare CPA Order 17 unconstitutional and to permanently enjoin the government from implementing it, or a similar policy, in the future.

---

[2] The government disputes that the order granted blanket immunity. Both parties agree that the text of the order itself suggests that it exempted coalition contractors from prosecution or civil suit in Iraqi courts only, and not from the application of U.S. law.  But the plaintiffs argue that the practical effect of the order, as it was applied to contractors in Iraq, was to exempt contractors from all legal accountability.

The family members and Bjorlin together focus on the government's refusal to negotiate with terrorists for the release of hostages, particularly as that policy blocks or impedes private efforts to secure a hostage's release. The family members allege that officials in the State Department prevented them from negotiating for the release of their relatives, in violation of their First Amendment guarantees of free speech and free assembly. Specifically, they allege that officials told them they could not meet with a United States citizen who had reportedly obtained information on the location and condition of the captured men. They also allege that the State Department blocked distribution of 90,000 flyers promising a reward for information about their missing relatives that the families had sent to "the Middle East."

The family members request a declaration that the government cannot prohibit family members from negotiating for the release of their captured relatives and an injunction against government policies, such as those alleged above, that violate their First Amendment rights. Plaintiff Bjorlin joins the family members' First Amendment claim. Contemplating employment in Iraq again, Bjorlin asserts it is foreseeable that he could be kidnapped and consequently injured by the government's policies impeding the efforts of family members seeking to secure the release of their captured relatives.

Finally, the family members claim that the government is unlawfully withholding money that belongs to them as survivors of their deceased contractor relatives, in violation of the Due Process and Takings Clauses of the Fifth Amendment. First, they allege that their relatives' employer, Crescent, owes them back pay for their relatives' time in captivity and life insurance proceeds that Crescent's insurer

paid to the company but were rightfully due family members as beneficiaries. The family members state that Crescent required them to sign releases of liability against the company and its owner in order to receive a portion of the proceeds but that some benefits are still being withheld.[3] The plaintiffs contend that the Secretary of State is "ultimately responsible for its contractor's nonpayment and retention of private benefits." Second, the family members claim entitlement to benefits under three federally administered compensation programs: the Longshore and Harbor Workers' Compensation Act, the Defense Base Act and the War Hazards Compensation Act. However, nothing in the record indicates that the plaintiffs sought these benefits directly from the agency that administers the programs, the Department of Labor.

The district court dismissed all claims against the government with prejudice, ruling (1) the plaintiffs lacked standing to pursue their policy claims for injunctive and declaratory relief, (2) those claims raised nonjusticiable political questions, (3) their monetary claims were barred by sovereign immunity, and (4) they failed to state a claim under the Takings Clause. The plaintiffs appeal. We have jurisdiction under 28 U.S.C. § 1291.[4]

---

[3] In their amended complaint, the plaintiffs also made claims against Lloyd's of London and CNA Financial Corporation, Crescent's insurers, regarding the insurance proceeds. The plaintiffs voluntarily dismissed those defendants in order to pursue this appeal.

[4] Because "the record reveals no evidence of intent to manipulate our appellate jurisdiction" through the plaintiffs' voluntary dismissal of the private defendants in this case, the district court's dismissal of the government defendants is final and appealable under § 1291. *Sneller v. City of Bainbridge Island*, 606 F.3d 636, 638 (9th Cir. 2010).

**STANDARD OF REVIEW**

We review de novo a district court's dismissal without leave to amend.  *See Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 772 (9th Cir. 2002).

**DISCUSSION**

**A.  Standing to Seek Equitable Relief**

Bjorlin and the family members contend they have Article III standing to seek declaratory and injunctive relief regarding the State Department's policies governing the immunity of security contractors and the handling of kidnappings in Iraq. We disagree.  Because the plaintiffs cannot show they are likely to be harmed by these alleged policies in the future, we do not have the authority in this case to determine the legality or constitutionality of the policies or to enjoin their implementation.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting U.S. Const. art. III, § 2).  "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process,'" *id.* (alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)), and "serves to prevent the judicial process from being used to usurp the powers of the political branches," *id.* (quoting *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013)).

To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection

between the injury and the conduct complained of and (3) a likelihood that the injury will be redressed by a favorable decision. *See id.* (citing *Lujan*, 504 U.S. at 560–61). The principal issue in this case is whether the plaintiffs have alleged an "injury in fact." "An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 2341 (quoting *Lujan*, 504 U.S. at 560) (some internal quotation marks omitted). The party asserting the claim has the burden of establishing standing. *See id.* at 2342.

### 1. Bjorlin

Bjorlin does not allege he has already been injured. Rather, he seeks prospective relief for an injury that might occur to him in the future. He bases his threat of injury on the experience of his former colleagues who were captured and killed in Iraq, allegedly as a result of CPA Order 17 and the State Department policies that impeded their family members from seeking their release.

The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (alterations in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Rather than requiring literal certainty, the Court has sometimes framed the injury requirement as a "substantial risk" that the harm will occur. *Id.* at 1150 n.5 (citing, *inter alia*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153 (2010)).

As the district court concluded, the threat of injury to Bjorlin from CPA Order 17 is too speculative to constitute

injury in fact. Even assuming that CPA Order 17 granted blanket immunity to contractors and contributed to a lawless atmosphere for security contractors in Iraq, Bjorlin acknowledges that the order is no longer in effect, although he speculates that it or a similar order could be reinstated in the future.[5] Moreover, even if he seeks such employment in the future, Bjorlin may or may not be hired to provide private security in Iraq. For Bjorlin to be injured in the future, therefore, he would have to be hired and sent to Iraq to perform security services again, the State Department would have to reinstate CPA Order 17 or a similar policy, and that policy would have to cause injury to Bjorlin in one of the ways he fears: by creating a lawless atmosphere that encourages his contractor employer to improperly provide for his safety, which then leads to his kidnapping, or by motivating an individual to kidnap him. The chain of events that must occur for Bjorlin to be injured by the now-inoperative Order 17 is on its face much too attenuated for the threatened injury to be certainly impending or to present a substantial risk of its occurrence. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 108–09 (1983) (holding that a plaintiff who had been subjected to an illegal chokehold by police did not have standing to pursue a prospective injunction against the use of chokeholds because it was too speculative that he would be stopped and illegally choked again). Moreover, Bjorlin has not alleged facts supporting his speculation that CPA Order 17 (or its equivalent) would likely be reinstated.

---

[5] As noted earlier, *supra* n.2, the government disputes that the order granted blanket immunity. Because the plaintiffs' lack of standing deprives this court of jurisdiction to adjudicate their claims regarding the order, we do not resolve the parties' dispute over the effect of the order.

Bjorlin alternatively argues that the government's earlier implementation of CPA Order 17, coupled with the government's ongoing assertion that the policy was legal, make him uncertain as to what policies the government will implement if he returns to Iraq as a security contractor.  This uncertainty, he contends, constitutes an injury in fact because it deters him from seeking work in a field of employment that may subject him to a policy he believes is illegal.  The Supreme Court rejected an analogous theory of injury in *Clapper*, in which the plaintiffs argued that their subjective fear of future violations of their rights deterred them from certain activities in the present.  *See* 133 S. Ct. at 1151–53. Acknowledging that, in some circumstances, a similar "chilling effect" can constitute a cognizable injury, the Court nonetheless drew the line at situations in which the chilling effect was based on a plaintiff's fear of future injury that itself was too speculative to confer standing.  *See id.* at 1152. The Court reasoned, "allowing [the plaintiffs] to bring this action based on costs they incurred in response to a speculative threat would be tantamount to accepting a repackaged version of [their] first failed theory of standing." *Id.* at 1151.  Here too, Bjorlin's alternative theory of injury fails because his deterrence from seeking employment is ultimately based on his fear of an injury that we have already determined is too speculative to confer standing.  *Cf. Drake v. Obama*, 664 F.3d 774, 780 (9th Cir. 2011) (holding a military service member's injury was "entirely speculative" when it was based on his fear of being penalized for obeying an order from the President that he believed would be unconstitutional).

Like his allegations regarding CPA Order 17, Bjorlin's allegations of the threat of injury from the government's hostage response policies are too speculative and abstract to

constitute injury in fact. Bjorlin alleges only that he will "likely be employed as a contractor in the region in the immediate future," and that he "may be kidnapped" and thereafter injured by the U.S. government's policies that impede the efforts of private citizens to secure the release of their captured relatives. First, he alleges no concrete plans to return, only an abstract "wish[]" to do so. Even if he seeks a position in private security in Iraq, he may not obtain one. His "some day" hope to return to Iraq is not the sort of specific planning that the Supreme Court has held is required to demonstrate that a future injury is sufficiently imminent for a federal court to address it prospectively. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). Second, even if Bjorlin's plans to return to Iraq were otherwise sufficiently concrete, his likelihood of being kidnapped would still be speculative. His supposed risks of injury are at least as speculative as Lyons' claim that he was likely to experience an illegal police chokehold again. *See Lyons*, 461 U.S. at 108 ("We cannot agree that the 'odds' that Lyons would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever are sufficient to make out a federal case for equitable relief." (citation omitted)). The same is true of Bjorlin's likelihood of being injured by the government's hostage response policies. The chain of events leading to injury from these policies is simply too hypothetical and attenuated to constitute injury in fact. As the district court summed up:

> What Mr. Bjorlin really seeks, then, is a declaration of his rights, *if* he elects to serve again, *if* he is hired by a contractor, *if* he is shipped overseas, *if* CPA Order 17 is still in effect or *if* another similar order instead

governs, and, with respect to the kidnapping declaration, *if* he is kidnapped, and *if* he is then held hostage. Based on this logic, almost any American even contemplating serving overseas could make roughly the same argument.

As with his claims regarding CPA Order 17, Bjorlin alternatively argues that his uncertainty about how the government will respond if he were to be taken hostage is itself an injury because that uncertainty deters him from seeking employment as a contractor. Because Bjorlin's feeling of deterrence is based on a fear of speculative future injury, this theory of injury fails. *See Clapper*, 133 S. Ct. at 1152–53.[6]

In sum, Bjorlin does not allege a sufficient likelihood of injury resulting from CPA Order 17 or the government's hostage response policy, nor is there any probability he could, given the many inherent contingencies. Therefore, he does not have standing to seek prospective declaratory and injunctive relief regarding those policies.

### 2. Family Members

Plaintiff family members challenge only the hostage response policies. Unlike Bjorlin, the family members assert that these policies infringed on their First Amendment rights in the past. But rather than seeking retrospective relief for

---

[6] We do not suggest that other persons claiming injury from the government's alleged hostage response policy in different circumstances would be unable to allege sufficient facts to establish Article III injury. *See infra* note 7.

past wrongs, like Bjorlin they ask the court to declare these policies unlawful and to enjoin their future implementation. They too lack standing because they have not alleged how the challenged policies are likely to affect them in the future.

"Past exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects. Nor does speculation or 'subjective apprehension' about future harm support standing." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) (citing *Lujan*, 504 U.S. at 564, and quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000)). "Once a plaintiff has been wronged, he is entitled to injunctive relief only if he can show that he faces a 'real or immediate threat . . . that he will again be wronged in a similar way.'" *Id.* (omission in original) (quoting *Lyons*, 461 U.S. at 111). Despite being harmed in the past, the family members must still show that the threat of injury in the future is "certainly impending" or that it presents a "substantial risk" of recurrence for the court to hear their claim for prospective relief. *Clapper*, 133 S. Ct. at 1147, 1150 n.5.

The family members have not alleged any facts demonstrating that they are likely to be reinjured by the hostage response policies. At oral argument, plaintiffs' counsel asserted for the first time that the family members might again seek to communicate within Iraq to determine who was responsible for the kidnapping and killing of their relatives. If so, counsel maintained, the government's past impediments to their private efforts during a hostage event

will once again be applied to them.[7]  This argument is waived because it was never presented to the district court below. *See AlohaCare v. Hawaii, Dep't of Human Servs.*, 572 F.3d 740, 745 (9th Cir. 2009).  In any event, this new assertion still would not demonstrate the likelihood of injury required for prospective relief.  The family members' statement that they *might* seek to communicate in Iraq to determine who killed their relatives, coupled with the fact that it is unclear how hostage response policies would even apply to an inquiry after the hostage event has concluded, make this claim too speculative to constitute injury in fact.  *See Lujan*, 504 U.S. at 564.

\* \* \*

We hold that the district court properly dismissed the plaintiffs' policy claims for lack of standing.  We therefore do not address the political question doctrine as an alternative basis for dismissing these claims.

---

[7] At oral argument, the government represented that there are no State Department policies preventing private individuals from making efforts to secure the release of relatives who are kidnapped abroad, citing the Foreign Affairs Manual.  That manual outlines the U.S. government's policies regarding communicating and coordinating with families of hostages or kidnapping victims.  *See* Hostage Taking and Kidnappings, 7 U.S. Department of State Foreign Affairs Manual 1820.  It states that, in the event a U.S. private citizen seeks the release of their relatives through the payment of ransom or through any other means that deviate from U.S. government policy, the government will limit its participation and cooperation.  *See id.* at 2.  *But see* Rukmini Callimachi, *The Cost of the U.S. Ban on Paying for Hostages*, N.Y. Times (Dec. 27, 2014) (reporting that at least one woman seeking the release of her kidnapped son was told by U.S. officials that she could be prosecuted for paying a ransom to her son's captors).

## B.  Jurisdiction over Monetary Claims

The district court dismissed the plaintiff family members' due process and Takings Clause claims for their relatives' back pay, unpaid insurance proceeds and withheld federal benefits for lack of subject matter jurisdiction and for failure to state a claim for relief.  *See* Fed. R. Civ. P. 12(b)(1), (b)(6). As an initial matter, we note that if the district court had no jurisdiction over the claims, its determination that the claims failed on their merits was a "nullity."  *Orff v. United States*, 358 F.3d 1137, 1149 (9th Cir. 2004).  So we address jurisdiction first.  We conclude that the plaintiffs have not alleged a waiver of sovereign immunity that would confer subject matter jurisdiction on the district court.

"Absent a waiver of sovereign immunity, courts have no subject matter jurisdiction over cases against the [federal] government."  *Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1117 (9th Cir. 2003) (citing *United States v. Mitchell*, 463 U.S. 206, 212 (1983)).  "[A]ny waiver 'must be unequivocally expressed in statutory text . . . and will not be implied.'"  *Ordonez v. United States*, 680 F.3d 1135, 1138 (9th Cir. 2012) (omission in original) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)).

The family members contend that the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2674, waives sovereign immunity for their claims.  However, they have missed a crucial first step.  The FTCA requires, as a prerequisite for federal court jurisdiction, that a claimant first provide written notification of the incident giving rise to the injury, accompanied by a claim for money damages to the federal agency responsible for the injury.  *See* 28 U.S.C. § 2675(a); 28 C.F.R. § 14.2(b); *Johnson v. United States*, 704 F.2d 1431, 1442 (9th Cir. 1983)

("Exhaustion of the claims procedures established under the Act is a prerequisite to district court jurisdiction."). The plaintiffs have not alleged or provided evidence that they have exhausted their administrative remedies under the FTCA, so they cannot rely on that statute's waiver of sovereign immunity for jurisdiction.

Alternatively, the plaintiffs cite two other federal statutes for waiver of sovereign immunity: 28 U.S.C. § 1343(a)(3) and § 1391(e). Section 1343(a)(3) is a general jurisdiction statute that "does not waive sovereign immunity." *Jachetta v. United States*, 653 F.3d 898, 908 (9th Cir. 2011). Section 1391(e) provides nationwide venue in the district courts for mandamus actions against federal officials, but does not waive sovereign immunity for suits for damages. *See Stafford v. Briggs*, 444 U.S. 527, 542 (1980); *Gilbert v. DaGrossa*, 756 F.2d 1455, 1460 (9th Cir. 1985).

Next, the plaintiffs argue that the district court has jurisdiction over their federal benefits claims because the United States has waived its sovereign immunity under the three federal statutes at issue: the Longshore and Harbor Workers' Compensation Act (LHWCA), the Defense Base Act (DBA) and the War Hazards Compensation Act (WHCA). District courts do not have jurisdiction over claims under the LHWCA, which must first be heard by the Department of Labor, whose determinations may later be appealed to the federal courts of appeals. *See* 33 U.S.C. §§ 913(a), 921(c); *Ingalls Shipbuilding, Inc. v. Dir., Office of Workers' Comp. Programs*, 519 U.S. 248, 262 (1997). The DBA incorporates the "protections and procedures" of the LHWCA, which include the requirement to file a claim with the Department of Labor before seeking judicial review. *Pearce v. Dir., OWCP*, 603 F.2d 763, 765, 770–71 (9th Cir.

1979); *see also Serv. Empls. Int'l, Inc. v. Dir., OWCP*, 595 F.3d 447, 452–54 (2d Cir. 2010).  Claims under the WHCA may be heard only through the Department of Labor's administrative process and are "not subject to review . . . by any court by mandamus or otherwise."  42 U.S.C. § 1715.

Although this court does not have jurisdiction over the federal benefit program claims, nothing in this opinion precludes the family member plaintiffs from seeking relief under these federal statutes through the proper administrative procedures.  As the government has represented to the court, "no statute of limitations would prevent filing a new administrative claim at this time."  Appellees' Supp. Br. 15.

The only possible waivers of sovereign immunity that the plaintiffs allege involve the Due Process and Takings Clauses of the Fifth Amendment.  But these provisions are not general waivers of sovereign immunity and do not establish jurisdiction in the district courts over monetary claims such as those brought by the plaintiffs.  Absent an independent waiver of sovereign immunity, due process and takings claims against the federal government in excess of $10,000, such as the family members' claims, fall under the exclusive jurisdiction of the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491.  *See McGuire v. United States*, 550 F.3d 903, 910–11 (9th Cir. 2008).  The district court correctly ruled that it lacked jurisdiction over the family members' monetary claims.

## C.  Transfer

The family members request that their claims be transferred to the Court of Federal Claims if this court lacks

jurisdiction.   If we lack jurisdiction over a civil action, 28 U.S.C. § 1631 directs us to transfer a case if (1) the court to which the action is to be transferred would have had jurisdiction "at the time [the action] was filed," and (2) "it is in the interest of justice" to transfer. *See also Clark v. Busey*, 959 F.2d 808, 812 (9th Cir. 1992).[8]  As discussed above, the due process and takings claims are the plaintiffs' only monetary claims for which sovereign immunity has potentially been waived, and the Tucker Act provides jurisdiction in the Court of Federal Claims for such claims. *See McGuire*, 550 F.3d at 910–11.

The government nonetheless argues that the Court of Federal Claims has no jurisdiction over the due process claim because it is not a "money-mandating" provision.   This argument goes too far.   "The Court of Federal Claims ordinarily lacks jurisdiction over due process claims under the Tucker Act, but has been held to have jurisdiction over illegal exaction claims 'when the exaction is based upon an asserted statutory power.'"   *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (citations omitted) (quoting *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996)).  "An illegal exaction involves a deprivation of property without due process of law," *id.*, which is exactly what the plaintiffs allege. But "[t]o invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by 'necessary implication,' that 'the remedy for its violation

---

[8] Although the plaintiffs did not move for transfer in the district court, we have held that such a motion is not required because § 1631 mandates that a court "shall" transfer if the necessary conditions are met. *See Hays v. Postmaster Gen. of U.S.*, 868 F.2d 328, 331 (9th Cir. 1989).

entails a return of money unlawfully exacted.'" *Id.* (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000)). The family members have alleged an exaction. Although they have not identified in their complaint a statutory power upon which the alleged exaction was based, we are not in a position to determine whether the complaint could be amended to satisfy this jurisdictional prerequisite. That determination is best left to the Court of Federal Claims, which has exclusive jurisdiction over Tucker Act claims such as this. *See McGuire*, 550 F.3d at 910–11.

The government contends the takings claims cannot be transferred because they are not colorable claims. To establish jurisdiction under the Tucker Act, however, "the Court of Federal Claims asks only whether the plaintiff is within the class of plaintiffs entitled to recover under the [provision] if the elements of a cause of action are established." *Greenlee Cnty. v. United States*, 487 F.3d 871, 876 (Fed. Cir. 2007). This jurisdictional inquiry goes only so far as to determine whether the provision being invoked is a "money-mandating" source of authority, not whether the plaintiffs' claims for relief have any merit. *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008); *see also In re United States*, 463 F.3d 1328, 1335 (Fed. Cir. 2006) (holding that jurisdiction was satisfied because the statute invoked was money-mandating, even though it was "clear from the face of [the] complaint that [the plaintiff did] not come within the reach of [the statute]"). Because the Takings Clause is a money-mandating provision, which would entitle the plaintiff family members to relief if they establish that the government deprived them of property to which they were entitled without just compensation, *see McGuire*, 550 F.3d at 911, the Court of Federal Claims would

have jurisdiction over their takings claims if they had been originally brought there. *See* 28 U.S.C. § 1631.

Even if the Court of Federal Claims would have jurisdiction over the due process and takings claims, we still must determine whether it would be "in the interest of justice" to transfer. *Id.* We ordinarily find transfer to be in the interest of justice where, as here, the plaintiffs appear to have been "unaware of or confused about the proper forum in which to file [their] action." *Puri v. Gonzales*, 464 F.3d 1038, 1043 (9th Cir. 2006). We therefore direct the district court, on remand, to transfer the due process and takings claims to the Court of Federal Claims.**[9]**

## CONCLUSION

We affirm the district court's dismissal of the plaintiffs' equitable claims due to lack of standing and their federal benefits claims due to lack of jurisdiction. We vacate dismissal of the due process and takings claims for withheld back pay and insurance proceeds. Pursuant to Federal Rule of Civil Procedure 21, we direct the district court to sever the due process and takings claims from the remainder of the case, and to transfer them the Court of Federal Claims. *See FDIC v. McGlamery*, 74 F.3d 218, 222 (10th Cir. 1996)

---

**[9]** Admittedly, the plaintiffs' allegations that the federal government is directly responsible for the withholding of insurance proceeds and back pay are quite spare. But we leave such issues to the court with jurisdiction over the claims.

(indicating that the district court should sever the claims under Rule 21 before transferring only part of the initial action).  Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, VACATED IN PART AND REMANDED.**

REINHARDT, Circuit Judge, concurring:

I join fully in Judge Fisher's opinion for the court. Although it answers every legal issue presented to us correctly, I would like to emphasize a few points, mainly to make certain that it is clear that it would not be appropriate for us to resolve in this case any questions regarding the proper policies for our government to follow with respect to the role of contractors in Iraq.  Nor, more important, would it be appropriate for us to determine here how the government, or the families of hostages, should deal with any terrorist group or other foreign entities who may hold captive relatives of citizens of the United States.

As to the former issue, it is agreed that the Order issued by the Coalition Provisional Authority governing contractors in Iraq is no longer in effect; nor is there any indication that it will be reinstated by the Coalition or by our government in the future.  Under these circumstances, the one plaintiff who tells us that he may someday want to work for a contractor in Iraq has no legal basis for requesting us to rule on a non-existent government policy.  Neither Mr. Bjorlin nor we have any idea what our policy may be as to government contractors if and when he ever decides to return to Iraq and is again

employed there. Under our longstanding rules, courts simply do not answer hypothetical questions of this kind.

The more troubling and painful question is what the role of our government should be if and when terrorist groups like ISIS or Al Queda capture an American citizen and hold him hostage, and whether the government may, or should, impose any limitation on the rights of the citizen's family or friends to communicate with that group or pay a ransom. It is significant that the government has told this court that currently there are no policies preventing private individuals from making efforts to secure the release of relatives who are held captive abroad. More important however from the standpoint of the legal rules that govern us, the parties bringing the action – relatives of contractors' employees "brutally killed," as Judge Fisher puts it, in the Middle East – seek no damages resulting from that policy but simply seek to have the policy declared unlawful. They ask that the government be enjoined from implementing the policy in the future. Again, even assuming that contrary to what the government tells us, such a policy exists, we cannot under well established legal rules render a decision that will be of no immediate benefit to the individuals bringing the lawsuit. Because the plaintiffs have no relatives currently in the Middle East, or currently in greater danger from terrorist groups than any of the rest of us, we again face only a hypothetical question – the kind that courts do not answer.[1]

---

[1] I do not preclude the possibility that under other circumstances, a court might find it necessary to consider the constitutionality of rules bearing on the subject at issue here. This is not that case, however, and further speculation on this point would be just that – speculation.

For theses reasons, we do not consider the wisdom, let alone the existence or the legality, of any government policy regarding how to deal with any terrorist groups that may in the future hold American citizens captive. That is a question that, for now at least, is best left to the American people.[2]

---

[2] Judge Fisher has correctly ordered that the claims for back pay, life insurance proceeds and government benefits filed by relatives of the murdered contractors be transferred to the Court of Claims. They are properly resolved by that court, not ours.